12074

STANTON v. EQUITABLE LIFE ASSURANCE SOCIETY

(135 S. E., 367)

1. INSURANCE—WHETHER INSURER, WHICH, WITH FULL KNOWLEDGE OF FACTS AFFECTING RISK, PROCURED RENEWAL OF APPLICATION, ONCE REJECTED AND ISSUED, "BINDING PREMIUM RECEIPT," THEREBY WAIVED OBJECTIONS AND EFFECTED VALID INSURANCE CONTRACT, HELD FOR JURY, NOTWITHSTANDING REJECTION OF APPLICATION, NOTICE OF WHICH DID NOT REACH INSURED BECAUSE OF DEATH.— Where insurer, with knowledge of applicant's past excessive use of intoxicants, requested him to renew application, accepted premium, and issued "binding receipt" stipulating insurance effective as of application date, whether insurer waived objections to impairment of risk and was bound by valid contract of insurance *held* for jury, notwithstanding home office's rejection of application, notice of which did not reach. insured because of death.

2. APPEAL AND ERROR.—Under Supreme Court Rule 4, § 8, judgment on application for insurance naming wife as beneficiary may be sustained, where record showed application was made for benefit of wife, notwithstanding pleading to which she was made party by amendment. stated cause of action in behalf of administrator; no question having been raised as to failure to state cause as to wife.

Before F. P. McGowan, Special Judge, Marlboro, February, 1924. Affirmed.

Action by Lila M. Stanton, individually and as administratrix of the estate of James Alexander Stanton, deceased, against the Equitable Life Assurance Society of the United States. Judgment for plaintiff, and defendant appeals.

*Messrs. Thomas & Lumpkin* and *Alexander & Green,* for appellant, cite: *Law applicable to binding receipts:* 124 S. C., 492; 93 S. C., 92; 77 S. C., 187; 4 S. C., 321; 163 N. C., 367; 79 S. E., 806; 48 L. R. A. (N. S.), 714; 145 Ky., 563; 36 L. R. A. (N. S.), 1211 and notes; 1 Cooley's Briefs, 426; 94 So., 424. *Damage must be proved:* 20 R. C. L., 11. *Defendant did not waive terms of binding receipt:*

NOTE: On effect of delay in passing upon application for insurance, see notes in 36 L. R. A. (N. S.), 1211; 51 L. R. A. (N. S.), 873; 15 A. L. R., 1026; 27 A. L. R., 464; 14 R. C. L., 896; 3 R. C. L. Supp., 310; 4 R. C. L. Supp., 928; 5 R. C. L. Supp., 784; 6 R. C. L. Supp., 838.

125 S. E., 290; 93 S. C., 90. *Meeting of minds of parties necessary to contract:* 36 L. R. A. (N. S.), 1215. *Extent of public interest in insurance business:* 104 S. C., 501; 53 L. Ed., 1011. *Cases of waiver of forfeiture distinguished:* 124 S. C., 387; 121 S. C., 378; 115 S. C., 319; 71 S. C., 360. *Offer of defendant to consider application of deceased did not waive terms of application:* 93 S. C., 91. *Court not to comment, or to charge, on facts:* 94 S. C., 324; 87 S. C., 407; 83 S. C., 53; 81 S. C., 541. *Negligence defined:* 20 R. C. L., 11. *Court not to make impassioned charge to jury:* 89 S. C., 153.

*Messrs. McColl & Stevenson,* for respondent, cite: *Cases distinguished:* 94 S. E., 424; 163 N. C., 367; 36 Ann. Cas., 652. *Effect of binding receipt:* 176 N. W., 207; 170 N. W., 159; 145 Ky., 563; 36 L. R. A., 1211; 184 S. W., 133; 58 S. W., 822; 22 Ky., 740; 41 Wash., 228; 82 P., 316. *Question whether intemperate habits will avoid policy is for jury:* 98 Ark., 136; 135 S. W., 838; 30 L. Ed., 1100; 13 Rose's Notes, 1086. *Rejection of application because of injury to applicant after issuance of binding receipt and before issuance of policy:* 144 F., 1005; 28 F., 705. *After issuance of binding receipt insurer may not reject arbitrarily:* 92 S. C., 282; 65 S. C., 290; 63 S. C., 290; 63 S. C., 198; 128 Wis., 348; 116 A. S. R., 50; 120 N. Y., 496; 17 A. S. R., 660; 63 Minn., 170; 56 A. S. R., 464; 101 N. Y., 387; 54 Am. Rep., 709. *Same; case distinguished:* 26 S. C., 91. *Defendant bound by estoppel or waiver:* 117 S. E., 209; 100 S. E., 157; 97 S. C., 417; 75 S. C., 315; 52 S. C., 224; 59 A. S. R., 144; 96 U. S., 572; 24 L. Ed., 841; 14 R. C. L., 1166. *Oral contract of insurance for one year from date enforcible:* 37 S. C., 56; 14 R. C. L., 880. *Defendant liable for negligent delay in acting on application:* 117 S. E., 720; 105 S. E., 305; 115 S. C., 318; 58 S. C., 204; 116 S. E., 267; 46 L. R. A. (N. S.), 25; 40 L. R. A. (N. S.), 164; 27 A. L. R., 444; 15 Am. Rep., 1021; 11 How. (N. Y.), 69; Ann. Cas., 1916-B, 674.

September 28, 1926.

The opinion of the Court was delivered by MR. JUSTICE WATTS.

This opinion was written by the late Mr. Justice Fraser and concurred in by me. I now adopt it as my opinion.

The brief in this case is very large. There are 18 exceptions, but the decision of one question determines the whole. case. The facts are undisputed and few.

In October, 1917, James Alexander Stanton applied to the appellant insurance company for a policy of life insurance in the sum of $25,000, and sent with his application a check to cover the first premium. There was no concealment of anything. Stanton was in good health and his physical condition was excellent. It was frankly stated that for some years Stanton had been in the habit of getting on periodical drunks and would continue drinking for several days, sometimes as long as 10 days; that he had inherited some financial troubles, but the financial trouble was over, and he had not taken any intoxicants for a year before the application of 1917.

The reply to the first application was:

"Oct. 29, 1917.

"Mr. P. G. Alston, McColl, S. C.—Dear Mr. Alston: Re Application James A. Stanton. We regret to advise that the society is unwilling to issue a policy to Mr. Stanton at this time. They state, however, that after the lapse of one year they shall be pleased to give the case further consideration.

"We inclose herewith the society's check for $939 representing the premium under this application, and would request that you kindly take up the conditional receipt and return, or have Mr. Stanton sign the inclosed release.

"Sincerely yours,           Managers."

At the lapse of the year in October, 1918, the home office of the company in New York wrote to its general office in Rock Hill, S. C., to open negotiations with Mr. Stanton. The South Carolina agents took up the matter with Mr. Stanton promptly, and took another application for the same amount of insurance, typewritten in the Rock Hill office. Mr. Stanton signed this application at the solicitation of the local agent, inspired by the home office. Mr. Stanton again put up his check for the first premium. The check was cashed at the general office at Rock Hill, S. C., and Mr. Stanton was given the following receipt:

"Received of J. A. Stanton, No. C. 43128, nine hundred and eighty-five and 50/100 dollars, the first annual premium on proposed insurance for $25,000 on the life of James A. Stanton, for which the above-mentioned application is this day made to the Equitable Life Assurance Society of the United States. Insurance subject to the terms and conditions of the policy contract shall take effect as of the date of this receipt, provided the applicant is on this date, in the opinion of the society's authorized officers in New York, an insurable risk under its rules, and the application is otherwise acceptable on the plan and for the amount and at the rate of premium applied for; otherwise, the payment evidenced by this receipt shall be returned on demand and the surrender of this receipt.

"Dated at Tatum, S. C., September 18, 1918.

"P. G. Alston, Agent."

This second application was refused. Mr. Stanton took the "flu," so prevalent at that time, and died before he heard from his application. The application was marked refused before the death of Mr. Stanton, but it was delayed in transit and never reached him. The company offered to return the premium, but the administratrix refused to receive it or to execute a release. This suit was brought for the amount of the policy applied for.

The answer denied that there was a contract of insurance, and also denied that Mr. Stanton was an insurable risk in 1918. There was no evidence that Mr. Stanton was not an insurable risk in 1918, other than his liability before 1917; so the only question is, Was there a contract of insurance?

If there was a contract of insurance, the premium has been paid and the insured is dead, and there is only one thing to do: Affirm the judgment. If there was no contract of insurance, then the judgment must be reversed.

The undisputed facts show that in 1917 a full investigation was made and all the facts were known. With full knowledge of the facts up to that time, the application was not refused as claimed by the appellant, but merely postponed for a year. With full knowledge of the facts, the insurance agent offered to take up the application in 1918. This was at the suggestion of the home office. This offer was on condition, of course. The company has not attempted to show a failure to comply with the conditions.

Dr. Albert T. Post, a medical director at the home office, testified:

"Q. Your consideration of the case disclosed no other ground for rejection, save the intemperate use of alcoholic beverages, that was all? A. Yes.

"Q. That was all? A. That was all.

"Q. Outside of that the applicant was a first-class risk, and, had it not been for the disclosure of the excessive indulgence in alcoholic liquors, you would have recommended him? A. Yes; I would have recommended the case in all other respects with the exception of his habits of intemperance."

Mr. W. G. Schelker, assistant secretary, wrote:

"We advise that this application was not rejected at the home office on account of anything occurring subsequent to the submission of the application as the society was not aware of any other change in the physical condition of the

applicant. This applicant was declined as, in the opinion of the society, from the use of intoxicants, he was such as to make him other than a standard risk."

There was not a word of testimony that the deceased had taken a single drink of intoxicant since his previous application in 1917. There was evidence that the applicant had not taken a drink of intoxicants since 1917. Knowing all of the facts, the company induced him to apply in 1918, took his money, gave him a receipt *declaring the applicant insured from the date of the receipt,* subject to the terms and conditions of the company. If there was no contract at all, why state that the insurance should take effect from the date of the receipt which was also the date of the payment of the premium?

It is very manifest that a nonsuit could not have been granted, and still more clear that a verdict could not have been directed. There was evidence to show that the application for insurance, signed by Mr. Stanton in 1918, was prepared in the Rock Hill office, and that the Rock Hill office was under the control of the home office, and the company took Mr. Stanton's money with a knowledge of all the facts.

It is claimed that there was no waiver. The company rejected the application when they knew all the facts upon which they based their offer in 1918. Did they waive them? That was at least a question for the jury.

II. Appellant alleges error in allowing Mrs. Stanton to testify as to a purchase of land made by Mr. Stanton during the probation period between the two applications. This was not error, as it was responsive to the question of damages from the negligence set up in the complaint.

III. Error is alleged in charging that life insurance is a business affected with public interest. It has not been shown that this was prejudicial. It in no way affected the case as to the making of the contract waivers.

IV. Error is alleged in charging:

"If the insurance company saw fit to intrust the delivering of this notice to its various agents instead of the customary channels of communication; the error being that same is a charge on the facts."

There is certainly no charge on the facts here.

V. The next error alleged is in charging:

"I charge you that if you find from the facts that the defendant, when it declined Stanton for a year in 1917."

Appellants certainly cannot complain of this. The appellant's officers had written:

"After one year shall have elapsed, we shall be glad to give this case further consideration."

This was more favorable to the appellant than the indorsement warranted.

VI. The next words complained of are:

"That under the terms of this receipt· that the defendant, insurance company, was also irrevocably bound to give Stanton insurance under the conditions named in the receipt."

His Honor did not charge the jury that the company was bound absolutely to give insurance, but that, if Mr. Stanton conformed to rules of the company, on the day the receipt was given, he was entitled to the insurance.

His Honor charged the jury that the application signed by the applicant and the receipt signed by the agent of the company, if they believed the agent of the company signed the receipt, made the contract between the parties, and, as the applicant was bound to take the policy, so the company was bound to give the policy if the applicant measured up to the standard. This was correct.

VII. Appellant complains of the use of the term "forfeiture" in the charge to the jury. Technically there was no forfeiture in the case, but it was so clear that his Honor was talking about waiver and estoppel that it was not misleading. Besides this, if his Honor misstated the issues, it was the duty of the appellant to call attention to it.

VIII. The last exception complains of a charge that was entirely favorable to the appellant.

The judgment appealed from is affirmed.

Mr. Acting Associate Justice Purdy concurs in result.

Mr. Acting Associate Justice Ramage concurs.

Messrs. Justices Cothran and Marion, dissent.

Mr. Chief Justice Gary did not participate.

Mr. Acting Associate Justice Purdy (concurring): I concur in the result of the opinion of Mr. Justice Watts. It is suggested that the insurance company had a right to demand that Mr. Stanton should be an insurable risk, unimpaired by the effects of drink. He was declined as an insurable risk, in October, 1918, wholly because of his past history in reference to intemperance; otherwise, he was in all respects a desirable risk.

On September 18, 1918, the company knew as much about Mr. Stanton's condition in this respect as it could ever know. It knew the effects that the excessive use of alcohol had upon the system of Mr. Stanton, and how he would likely be affected by it thereafter. With this knowledge, it caused him to file another application. It was left to the jury, in effect, to say whether or not this conduct on the part of the company was evidence of its intention to insure him, notwithstanding his physical impairment, caused by drink.

A further examination by the company, under the application of September 18, 1918, did not disclose any ravages or impairment that did not exist at the time that his application was rejected in 1917.

Applying the rule of reason and of common sense, this Court ought not to undertake to say, as a matter of law, that the case should not have been submitted to the jury, and, having been submitted to the jury, and the trial Judge having refused to set aside the verdict, the judgment based upon it should be affirmed.

This decision has not been reached without the gravest consideration. In concurring with the affirmance of the judgment, I do not desire it to be understood, or intimated, that, where there has been an application for insurance, the filing of another application is a waiver of any known physical defects which existed at the time of the prior physical examination. To .so hold would greatly hamper the procuring of insurance by an insurable risk, because the insurance companies would hesitate to accept an application after an applicant had been once rejected, if such were laid down as a rule. Each case must be decided under the facts of that case.

This case has had the gravest consideration also from another standpoint. The pleadings, as set out in the record, show that the complaint was brought solely for the benefit of the estate of Mr. Stanton. The first application was made out for the benefit of his estate. The second application was made out for the benefit of Mrs. Stanton, whose name appears upon the present record as one of the plaintiffs.

The following statements appear in the record:

"The original action was filed in the name of Mrs. Stanton, as administratrix; the complaint was amended, however, on the first trial, on motion of plaintiff's counsel, making Mrs. Stanton, individually, a party to the suit."

At the commencement of the trial it was said:

"It is admitted that Mrs. Lila M. Stanton is the duly qualified administrator of the estate of James Alexander Stanton, deceased. It is also admitted that there has been an amendment of the complaint, making Mrs. Lila M. Stanton a party as an individual, also."

After setting out at great length the facts upon which the plaintiff, as administratrix, relied to recover, the complaint concluded, just before the prayer for ·relief, as follows:

"That by reason of the negligent, willful, wanton, and fraudulent conduct, as aforesaid, the decedent and his estate were and are damaged in the sum of $30,000."

If there was only motion to strike out any part of the complaint and to substitute apt allegations in behalf of Mrs. Stanton, they do not appear in the record.

The pleadings are most tersely analyzed in the dissenting opinion of Mr. Justice Cothran, and it is unnecessary to make further reference to them here.

At the trial the application of September 18, 1918, was put in evidence, along with the application of 1917. The application of September 18, 1918, shows that it was made for the benefit of Mrs. Stanton. At the conclusion of the testimony there was not any motion made to amend the pleadings to conform to the facts as proven; nor did the counsel for the defendant at any time make any reference to a failure to allege any cause of action in favor of Mrs. Stanton.

These matters are not referred to by way of criticizing the conduct of the case as to either counsel, all of whom are known to the court to be men of great ability and zeal, and all of whom, doubtless, had the best of reasons for adopting the methods pursued in the trial of the case. Yet, as the pleadings and proof in the case stand, the court will exercise its right under rule 4 to sustain the judgment upon the ground which appears in the record, viz.: that the application of September 18, 1918, was made for the benefit of Mrs. Stanton.

Rule 4, § 8, provides:

"Sec. 8. While respondent may be restricted in argument to such additional sustaining grounds as noticed by him, this court reserves the right to sustain any ruling, order or judgment upon any grounds appearing in the record."

MR. JUSTICE WATTS and MR. ACTING ASSOCIATE JUSTICE RAMAGE concur with MR. ACTING ASSOCIATE JUSTICE PURDY.

MR. JUSTICE COTHRAN (dissenting) : This is an action, not upon a policy of life insurance, for such has never been issued. It is based upon the following facts which are practically undisputed:

On October 4, 1917, James A. Stanton applied to the defendant for $25,000 insurance, payable in the event of his death to his estate. The application showed, above the signature of the applicant, that he had, during the then past 5 years, used alcoholic beverages to the extent of intoxication. The medical examination was made by Dr. J. H. Reese, a local physician for the company, who reported that the applicant had been addicted to strong drink for 10 years, at times to excess, but that he had been abstemious for the last 6 months; that, except for the matter of drinking, he knew of no reason why he should not be classed as a first-rate risk. This report was forwarded along with the application, to the company, which instituted an independent investigation upon its own account, receiving special reports from Mr. J. K. Owens, of Bennettsville, and Mr. J. B. Tatum, of Tatum. Each of these reports was favorable to the applicant, except as to past intemperance, recommended him as a good risk, and showed him to be a man of good character, active and prosperously in business. At the time the application, the applicant gave to the agent a check for the first year's premium, and received from him one of the company's "binding receipts," which will hereafter be explained.

After investigation and consideration of the application and reports, the company declined to issue the policy, returned the check which Stanton had given, and took from him a release of all liability, dated October 27, 1917. The action of the medical men in New York upon the application, as indicated in the "rating sheet," a record of the company, was, "October 25, 1917, declined for one year"; and the testimony of one of those: "I declined the application for one year." On October 27, 1917, the company wrote

the cashier of its Rock Hill office, through whom the application had been received, declining the policy, saying:

"Confidentially, we may tell you that our reasons for the above (declination) are because of a feature which we do not care to take up by correspondence. After one year shall have elapsed *we shall be glad to give this case further consideration.*"

It appears from the testimony of the medical men, and the explanation of certain symbols of the "rating sheet", that the application was declined upon the ground of excessive use of intoxicating liquor, a fact admitted in the complaint:

"Which application was subsequently rejected by defendant on the alleged ground that decedent was intemperate in use of alcoholic liquors."

On October 29, 1917, the Rock Hill office notified the agent through whom the application was made of the declination of the application, adding:

"They state, however, that, after the lapse of one year, they shall be pleased to give the case further consideration."

Thereupon the advance payment made by Stanton was returned to him, the "binding receipt" was returned to the company, and a release was signed by Stanton.

No objection was interposed to the rejection of this application, and during the year following the applicant obtained other insurance from other companies and could have obtained more, which he would have done but for the promise of the defendant (as it is alleged).

On September 16, 1918, the Rock Hill office, acting manifestly upon the promise of the company to give Stanton's application further consideration after the lapse of a year, mailed to the local agent at McColl, S. C., a blank application for Stanton to fill out and sign. Accordingly Stanton signed this second application, dated September 18, 1918, for $25,000 insurance, payable in the event of his death, to his wife, although, as a matter of fact, the year

from October 25, 1917, had not then elapsed. He pursued the same course as in the application of 1917, by paying in cash (check) the first annual premium, $985.50, and received from the local agent what is known as a "binding receipt" as follows:

"Received of J. A. Stanton * * * No. C. 43128 * * * nine hundred and eighty-five and 50/100 dollars on proposed insurance for $25,000 * * * on the life of James A. Stanton * * * for which the above-mentioned application is this day made to the Equitable Life Assurance Society of the United States. Insurance, subject to the terms and conditions of the policy contract, shall take effect as of the date of this receipt, provided the applicant is on this date in the opinion of the society's authorized officers in New York, an insurable risk under its rules, and the applications otherwise acceptable on the plan and for the amount and at the rate of premium applied for; otherwise, the payment evidenced by this receipt shall be returned on demand and the surrender of this receipt.

"Dated at Tatum, S. C., September 18, 1918.

"P. H. Alston, Agent."

Accompanying the application was a medical report from the same local examiner who had made the report accompanying the application of 1917. His report contained this statement:

"Applicant drank periodically for years, but stopped, and has drank nothing to my knowledge, and I see him every day, since March, 1917. I firmly *believe* that he has given up *the habit* entirely; hence my reason for recommending him first class."

The application, report of Dr. Reese, local medical examiner and the check appear to have been forwarded by the local agent to the Rock Hill office, and by them to the Atlanta office, for on September 19th a request was made by Dr. Van de Veer, of the Atlanta office, of J. B. Tatum, of Tatum, S. C., for a detailed report upon the applicant.

On September 21st the application and medical report were received by the New York office. On September 24th Tatum reported that in the past Stanton had drunk to excess, but that he had not been intoxicated in the last 12 months. On October 4th the Atlanta office made a similar request of T. C. Hamer, of Bennettsville, and on October 5th he reported that Stanton "used to drink to excess, but had not done so for about 3 years." On October 10th all the papers were referred to the medical directors in the New York office, who, on the same day, declined the application upon the reports as to excessive use of intoxicating liquors (as they state). On October 11th the New York office notified the Rock Hill office that the application had been declined. On October 12th Stanton was taken sick with influenza and pneumonia. On October 19th the Rock Hill office forwarded to the local agent at McColl, S. C., a check for the amount of the initial premium paid to Stanton, with directions to deliver it to Stanton, and take up the receipt which had been given him. At that time the local agent was at Warrenton, N. C., to which point the letter was forwarded, but it did not reach him until after Stanton's death on October 21st. The local agent then forwarded the check to the plaintiff, Mrs. Stanton, who declined to accept it.

The case was tried by Special Judge Hon. F. P. McGowan and a jury, and resulted in a verdict in favor of the plaintiff for $34,070.82; that is, for $25,000, with interest from December 21, 1918. The defendant appeals.

The complaint contains no allegation that either the plaintiff individually or the estate of James A. Stanton was made the beneficiary of the alleged contract *for* insurance. There being no allegation in the complaint that the plaintiff, as an individual, was made the beneficiary of the alleged contract for insurance, as such she has no cause of action, either upon the alleged contract or for damages on account of its breach. The action can therefore be maintained, if at all, only in the right of the plaintiff as administratrix.

The complaint was originally brought in the name of Mrs. Stanton as administratrix, and later, by amendment, Mrs. Stanton as an individual was made a party plaintiff. It seems clear that a cause of action could not exist in favor of both the plaintiff as an individual and the plaintiff as administratrix of the estate of Stanton; nor could there be a joint action in favor of the estate and Mrs. Stanton as beneficiary. The cause of action must have been, if at all, in favor of one or the other. The application of 1917 was for insurance payable to the estate; that of 1918, to Mrs. Stanton as the wife of the applicant. The cause of action in favor of the estate must have been based upon transactions in connection with the application of 1917; that in favor of Mrs. Stanton, with the application of 1918.

There is not a syllable in the complaint showing a cause of action in favor of Mrs. Stanton as an individual, which could only have been maintained upon the application and receipt of 1918. It is manifest, therefore, that the cause of action is based entirely upon the transactions connected with the application of 1917. We think this logically follows from the foregoing, and from the specific allegations of the complaint.

In the complaint it is alleged:

1. The representative character of the plaintiff; an allegation appropriate to a cause of action in favor of the administratrix.

2. The corporate capacity of the defendant; a matter not in issue, and appropriate to either cause of action.

3. The application of 1917; its rejection on the alleged ground of intemperance; the promise of the company "that it would at the expiration of a year insure him for said sum, provided he should continue temperate in his habits for that period and at the expiration thereof make a satisfactory showing under the examination of the defendant's physician"; that Stanton complied with these conditions; that during the year he could have obtained other insurance,

·but relied upon the "definite promise" of the defendant and did not obtain from other companies the amount of insurance he considered necessary; that on September 18, 1918, the defendant, *in pursuance of its promise,* offered to insure Stanton for $25,000; that Stanton accepted the proposition, paid the first premium in advance, and successfully passed the medical examination; *that the insurance contract thus entered into* was in force when Stanton died, but that the defendant has refused to pay it.

4. That all of the acts on the part of the defendant, above referred to *"were in completion of defendant's plan and promise to insure decedent at the end of one year from his first application and subsequent rejection";* that the defendant by its inexcusable delay, under the circumstances, when the applicant might have obtained other insurance, led the applicant to believe that it would issue the policy, and is estopped from denying its assent to the contract of insurance.

5. This paragraph is but an amplification in great detail of the former positions taken by the plaintiff *as administratrix,* involving the promise made in September, 1917, the inexcusable delay, estoppel, fraud in withholding the policy, etc.

The following paragraphs in the complaint are significant as showing the cause of action relied upon:

"That the defendant by its * * * conduct * * * inflicted great and irreparable damages *on the decedent and his estate.* * * *

"That by reason of the * * * conduct of the defendant as aforesaid *the decendent and his estate* were and are damaged in the sum of $30,000."

From this it is manifest that the cause of action is based upon damage alleged to have been caused *to the estate of Stanton* by reason of the breach of the contract made in September, 1917, that the defendant "would at the expiration of a year insure him (Stanton) for said sum, provided he

should continue in his temperate habits for that period and, at the expiration thereof, make a satisfactory showing under the examination of the defendant's physician."

The complaint, therefore, being on behalf of the administratrix, necessarily based upon the application of 1917, and the transactions connected with it, including the application, and the binding receipt of 1918, let us examine the complaint for the basis of the plaintiff's action as administratrix.

It is alleged that on October 4, 1917, Stanton made application for $25,000 insurance; that the application was subsequently rejected "on the alleged ground that the decedent was intemperate in the use of alcoholic liquors"; that when the application was declined there was an agreement between Stanton and the company, "that it would, at the expiration of a year, insure him for said sum, provided he should continue temperate for that period, and, at the expiration thereof, make a satisfactory showing under the examination of defendant's physician"; that the decedent complied with the above condition; that on or about September 18, 1918, the defendant, in pursuance of its promise above recited, voluntarily and of its own initiative renewed negotations with the decedent and offered to insure him for $25,000; that the decedent accepted that offer; that he filed an application therefor and at the same time paid to the defendant, in advance, the amount of the first premium; "that all of these acts on the part of the decedent were at the invitation and request of the defendant, and were in completion of defendant's plan and promise to insure decedent at the end of one year from his first application and subsequent rejection."

It is further alleged in the complaint that, by reason of the defendant's agreement in 1917, the offer to insure in 1918, the application and the payment of the premium in advance, a contract of insurance was consummated and was of force at the time of Stanton's death; that the insurance took effect on September 18, 1918; and that the defendant, by its failure to terminate the contract before the death of

Stanton, is estopped now to deny its assent to the contract of insurance.

It is further alleged that on September 18, 1918, the decedent was a stalwart, robust man, 35 years old and in perfect health, temperate in his habits and an insurable risk; that the defendant failed to discharge its duty to notify him that it proposed to withdraw from the contract "whereby it assured the decedent that he would be insured until notice of rejection, from September 18, 1918, while the decedent had the opportunity to apply elsewhere for insurance."

It is alleged that the defendant held up and unreasonably delayed action upon decedent's application and policy and failed in its duty to notify him of its rejection, until it was too late to obtain other insurance, which he could and would have obtained.

It is further alleged that the conduct of the defendant in refusing to issue a policy and to act upon the application within a reasonable time was dictated by an intent to over-reach, deceive, and defraud the decedent, and to hold the insurance in abeyance, while using the money paid by him, until the subsidence of an epidemic of influenza which swept over the country shortly after the application was filed.

It will be observed that the complaint contains no reference to the binding receipt which was issued at the time the decedent made the advance payment of the premium. The clear intendment of the complaint is to rely upon the alleged contract to insure at the end of the year, followed by an offer to insure, the written application, and the advance payment; all of which, it is contended, constituted a contract of immediate insurance on September 18, 1918, to hold good until the company signified its intention to reject the application, and that by its laches and delay, the company was, under the circumstances, estopped from denying its liability upon the contract alleged to have been so consummated.

There is not a particle of evidence in the case tending to sustain the allegation in the complaint that upon the rejection of the application of 1917 the company made an agreement with Stanton that, if he would remain temperate for a year, at the end of that period they would issue to him a policy as applied for in the rejected application. All that appears is that the application of 1917 was "declined for a year," upon the ground, as alleged *in the complaint* and shown by the evidence incontrovertibly, of the applicant's excessive use of intoxicating liquor, *and at the end of a year the application would be given further consideration.*

If there had been any evidence tending to establish such a statement by the company, it could not be considered a valid contract for lack of mutuality and consideration; there is nothing to show any obligation upon Stanton's part to accept and pay for a policy if it had been offered under such alleged circumstances; at most it was a voluntary statement or promise of the company binding it to no action.

If there had been any such verbal understanding between Stanton and the company, is it not remarkable that it was not recalled in the negotiations connected with the application of 1918? And yet, then we find him making a *new application,* as if there never had been one before, in which no reference is made to any such contract, and accepting a binding receipt for the advance premium utterly inconsistent with such verbal understanding: "Provided the applicant is upon this date, in the opinion of the society's authorized officers in New York, an insurable risk under its rules"— leaving the question absolutely open as to his insurability regardless of any such agreement as is alleged.

The plaintiff has therefore utterly failed to offer any evidence tending to establish the contract *alleged in the complaint,* and, of course, is not entitled to recover upon some other contract. But, it is contended, the binding receipt constituted an immediate present contract of insurance, which

insured the applicant until the company acted upon the application.

The matter for consideration, therefore, is the proper construction of the binding receipt, with particular reference to the question whether it constituted a present, immediate insurance of the applicant, terminable by the honest and reasonable decision by the company that he was not an insurable risk at the time of the application, or whether it was but a conditional contract that the applicant should not be insured at all until such decision had been made in his favor and that in that event the insurance should take effect as of the date of the application.

The express terms of the receipt leave no room for doubt upon this question. In the first place the advance premium is acknowledged to have been received "on *proposed* insurance for $25,000 on the life of James A. Stanton," which promptly negatived the idea of present, immediate insurance. In the second place, upon the precise question whether the insurance took effect at the time of the application, the receipt contains a proviso containing the express and exclusive condition upon which that effect could take place:

"Insurance, subject to the terms of the policy contract, shall take effect as of the date of this receipt, *provided* the applicant is, on this date, *in the opinion of the society's authorized officers* in New York, *an insurable risk* under its rules."

This means that in the event that the company accepted the application, or, as we shall see, in the exercise of a fair, honest, and reasonable judgment, should have decided that the applicant was an insurable risk at the time of the application, the insurance would be held effective from the time of the application, thus insuring the applicant against contingencies intervening between the time of the application and the time when the company should have issued a policy; in other words, if as a matter of fact the applicant was an insurable risk at the time of the application, and died before

the company actually passed upon his application, as a result of a supervening contingency, the insurance would have become effective.

It is not at all a one-sided contract.  For the use of the applicant's money, during the period of an incomplete contract of insurance, the applicant's insurance, if subsequently accepted or should have been, covers the period of uncertainty.  If the application should be rejected the applicant receives back the entire payment in advance made by him. He is out the use of his money during that period and has received the benefit of conditional insurance therefor.  We see nothing immoral, illegal, or without consideration in such a contract; it is a matter of everyday occurrence in fire insurance.

There are several forms of so-called "binding receipts." In some of them it is expressly provided that the insurance shall begin immediately upon the payment of the premium; nothing remaining to be done except the issuance of the policy.  In such case if loss should occur before the policy is issued, the insurance is effective.  In others it is provided that the insurance shall not become effective until the company has actually approved the application, leaving that question absolutely at the will and pleasure of the company.  In such case the contract must control and the condition be enforced.  In others it is provided that the insurance should take effect from the time of the application provided that the applicant is an insurable risk at that time.  In such case, if such be the fact, regardless of the company's action, the insurance is effective.  In others, and the present case is an illustration, it is provided that the insurance shall take effect from the time of the application, provided that the applicant is *in the opinion of the company,* an insurable risk at that time.  In such case, as we shall set, the fact of insurability is not conclusive, and, notwithstanding the insurability of the applicant, the judgment of the company upon

that issue will not be disturbed unless it be shown to have been exercised arbitrarily.

As is said by Mr. Joyce, Vol. 1 (2nd Ed.), § 64:

"Where an agreement is made between the applicant and the agent * * * that no liability shall attach until the principal approves the risk and a receipt is given the agent, such acceptance is merely conditional and is subordinated to the act of the company in approving or rejecting; *so in life insurance a binding slip or binding receipt does not insure of itself.* When properly executed it protects the applicant .for insurance against the contingency of sickness intervening its date and the delivery of the policy, if the application is accepted. If the latter is not accepted or refused, in the valid exercise by the company of its rights, the binding slip ceases *eo instanti* to have any effect."

"Where a receipt by an insurance agent to an applicant for payment of premium states that if the application is approved the insurance will be in force from the date of the medical examination, it refers to the examination the result of which is forwarded to the company and not to one which is withheld by the examiner because not satisfactory. Such a receipt does not put the insurance in force pending a decision upon the application." Joyce, Insurance (2d Ed.) § 64.

In *Mohrstadt v. Insurance Co.,* 115 F., 81; 52 C. C. A., 675, the Court holds (quoting syllabus):

"An application was given to a local agent of defendant * * * for a policy of insurance on a certain plan. The applicant also delivered his note to the agent for the amount of the first annual premium on such policy, and was given a receipt on a form prescribed by defendant, which contained the following provision: 'Said policy of insurance to take effect and be in force * * * provided the said application shall be accepted by the said company; but, should the same be declined or rejected by said company, then the full amount hereby paid shall be returned to applicant upon the delivery

of this receipt.'    Defendant declined to issue the policy applied for, but issued one on a different plan, and forwarded it to be submitted to the applicant; but he died before it had been submitted, and without having been notified of defendant's action.    Held, that the receipt did not constitute a contract for temporary insurance, to remain in force until such time as defendant should act on the application, but was merely a qualified acceptance of the risk, the insurance to become effective only if the application was approved by defendant, and that the same having been, in effect, rejected, there was no contract of insurance by which defendant was bound."

In *Pace v. Assurance Co.,* 113 F., 13; 51 C. C. A., 32, the Court holds (quoting syllabus) :

"A receipt given by an agent of a life insurance company for the first premium on a policy cannot be held to have effected a contract of insurance contrary to a provision of the application, taken contemporaneously, that no contract should be created unless the application was accepted by the company."

In *Cooksey v. Insurance Co.,* 73 Ark., 117; 83 S. W., 317; 108 Am. St. Rep., 26, the Court holds (quoting syllabus) :

"If a person applies for life insurance and pays an amount equal to the first premium, but the application and the receipt for the money paid stipulate that the insurance is to become effective only when the application is approved and the policy issued, the transaction does not amount to an agreement for preliminary or temporary insurance."

In *N. W. Mut. Life Ins. Co. v. Neafus,* 145 Ky., 563; 140 S. W., 1026; 36 L. R. A. (N. S.), 1211, the facts and conclusions of law sufficiently appear from the following extract from the opinion of the Court:

"The receipt is not complicated or difficult to understand. It is a brief, plainly written paper that any person of ordinary intelligence could readily and easily comprehend the meaning

of. Nor is it susceptible of two interpretations. It states that, an application for a $1,000 policy having been made by T. J. Neafus to the company, there has been collected of him $27.71, to be considered the first annual premium on said policy, provided the application is approved by the company at his home office, and, in that event, the insurance, as applied for, will be in force from the date of the medical examination. It is plain that to construe this receipt into an obligation on the part of the company that it had insured Neafus from the date of the medical examination until he was rejected would make a radical and material alteration in its terms. To so construe it, we must make the receipt read, in substance, that in consideration of the premium the insurance, as applied for, will be in force from the date of the medical examination until the application has been approved or rejected by the company, thereby putting into the receipt words that cannot be inserted without giving to it a meaning entirely different from what it was intended to have, and making in fact a contract between the parties that neither of them at the time had in mind. * * * There is nothing unfair or unreasonable or oppressive in the conditions of this receipt. It is simply a proposition made by the company to the applicant. It, in substance, tells him that if he wants insurance he can pay the first premium, submit to a medical examination, and then, if the company regards him as a desirable risk, it will issue to him a policy that will relate back to and be in effect from the date of the medical examination. When the applicant accepts this proposal, he agrees to its terms and conditions, and cannot be excused from knowing when his insurance will begin. If we should say that under the receipt the applicant was insured from the date of his medical examination, although the company might reject the application, we would put the company in the attitude of insuring a person, whether he was a desirable risk or not. It would place upon it the burden of carry-

ing, without its consent, a risk that it did not and would not assume."

The Court overruled a previous Kentucky case (*Halle v. New York Life Ins. Co.,* 22 Ky. Law Rep., 740; 58 S. W., 822) so far as it held to the contrary.

So in the case at bar it may truly be said that, if this Court should rule that under the receipt in question Stanton was insured from the date of the application, although the company reserved the right to reject the application upon the ground that in its opinion he was not an insurable risk at the time of the application, the company would be placed in the attitude of insuring a person whether he was a desirable risk or not, assuming, of course, that the company acted reasonably and fairly in deciding that he was not an insurable risk.

"To be binding as a contract of insurance, a preliminary contract must be one for present insurance and not merely an agreement to insure at some future time, as on acceptance of an application, or on the issuance or delivery of a policy. There must be both an agreement and a consideration for present insurance of a temporary nature." 32 C. J., 1099.

In *Mohrstadt v. Insurance Co.,* 115 F., 81; 52 C. C. A., 675, the Court says:

"The receipt, as it will be observed, contains the stipulation: 'Said policy of insurance to take effect and be in force from and after the date hereof, provided the said application shall be accepted by said company.' The natural interpretation of this clause would seem to be that the word 'provided' was used, as it generally is, in the sense of 'if,' and that the risk was to take effect as of the date specified 'if' the application, on examination and approval at the home office, was accepted, and only in that event. When that was done the company was willing that the risk should commence as of the date of the receipt, although the execution of the policy, embodying all of the terms of the contract, might be delayed for a considerable period. The opposite con-

struction of the receipt, above suggested, not only runs counter to the usual meaning of the words employed to express the agreement of the parties, but it, in fact, arms local agents with a power not usually intrusted to them, to saddle the company with large liabilities for temporary insurance before the chief medical officers of the company have had any opportunity to examine and approve such risks. A receipt identical in form with the one now under consideration, and issued by the same company, was before the Supreme Court of the United States for construction in a case heretofore cited ( [*Mut. Life*] *Insurance Co. v. Young's Adm'r*, 90 U. S., [23 Wall.], 85, 106; 23 L. Ed., 152), and the Court held, as we construe the opinion, that a receipt in such a form is not an absolute assumption of a risk temporarily (that is to say, until such time as the application is accepted or rejected), but that it is a qualified acceptance; the risk taking effect only in the event that the application is accepted, and that the company elects, after examining it, to issue such a policy as is applied for."

"When properly executed, the 'binding slip' protects the applicant for insurance against the contingency of sickness intervening its date and the delivery of the policy, if the application for insurance is accepted. If the application is not accepted in the proper exercise of the company's right, and the insurance, therefore, is refused, the 'binding slip' ceases *eo instanti* to have any effect. It does not insure of itself, but is merely a provision against any illness supervening it, if there is afterwards an acceptance of the application, upon which it depends for its vitality." *Gardner v. North State Ins. Co.*, 163 N. C., 367; 79 S. E., 806; 48 L. R. A. (N. S.), 716, Ann. Cas., 1915-B, 652.

In *State ex rel. Equitable Life Assur. Soc. v. Robertson* (Mo. Sup.), 191 S. W., 989, the precise binding receipt as in the case at bar was under consideration. The Court held that the receipt did not constitute a contract for immediate insurance, but that the insurance was not to be effective until

the officers of the company in New York approved the application.    See, also, *Reynolds v. Insurance Co.*, 189 Iowa, 76; 176 N. W., 207, where a similar receipt was similarly construed.    *Johnson v. Insurance Co.*, 212 Mo. App., 290; 249 S. W., 115.

In 1 Cooley's Briefs on Insurance, p. 413, it is said:

"The making of an application is, however, merely a step in the creation of a contract.    As was said in *Lee v. Guardian Life Ins. Co.* (Fed. Cas., No. 8,190), the rights of the applicant are not concluded by the making out of the application. When the application is made out and forwarded to the company, it is not yet a contract of insurance.    It has then only attained the position of a proposition on one side, which must be accepted on the other; that is to say, until it is accepted by some one having authority to accept the terms proposed, but merely a proposal."

Supporting this statement the author cites at least 30 cases.    The above quotation is reproduced from the case of *Shawnee Ins. Co. v. McClure,* 39 Okl., 535; 135 P., 1150; 49 L. R. A. (N. S.), 1054, in which there are as many additional authorities cited.

The receipt upon its face appears to lodge the arbitrary power with the officers of the company to decide whether the applicant was on September 18, 1918, an insurable risk under its rules.    But notwithstanding, the case falls under the well-established rule that in ordinary business transactions, not involving matters of personal taste and convenience, neither party has the arbitrary right to decide the existence of a particular fact upon which his obligation under the contract depends.    The parties may contract to leave the decision of that issue to one or the other, but the law requires that in that decision the party who is vested with the power of decision shall act fairly, honestly, and reasonably, in view of all circumstances, and that the other party shall not be bound by that decision when it is shown

that the power of decision has been exercised arbitrarily, capriciously, and unreasonably.

"It is bad faith and unfair dealing for a person to act unreasonably in an ordinary business transaction when there is nothing in the contract of a personal nature. The action of the insurance company in the case under consideration was not dependent upon taste or upon any fact of a personal nature but solely upon the existence of a fact in an ordinary business transaction, and it would be bad faith for it to refuse to be governed by reason and common sense in determining the existence of such fact." *Thompson v. Insurance Co.,* 63 S. C., 290; 41 S. E., 464.

In the case of *Guaranty Co. v. Charles,* 92 S. C., 288; 75 S. E., 387, Ann. Cas., 1916-B, 687, a minor son of the defendant was employed as an express messenger; the Guaranty Company had gone on his bond; the defendant gave to the Guaranty Company a bond to indemnify it from all loss it might sustain under its guaranty to the Express Company. This bond contained a provision that—

"The vouchers or other proper evidence showing payment to the Guaranty Company of any such loss, damage, or expense, shall be conclusive evidence (except for fraud), against me and my estate, of the fact and the amount of my liability hereunder to said Guaranty Company."

The Circuit Judge sustained the contention of the Guaranty Company under this provision. The defendant, upon appeal, contended that—

"Such stipulation amounts to a submission to one of the parties to a contract, the final and absolute decision of questions arising under the contract, depriving the other party of his right to inquire into the reasonable care and honest judgment of such arbitrator; the object of the contract not being to gratify taste, serve personal convenience, or satisfy individual preference."

The Court sustained the defendant's appeal, under the authority of the case of *Thompson v. Insurance Co.,* 63 S. C., 290; 41 S. E., 464, saying:

"It would be against public policy if the action of the plaintiff was not to be tested by the rules of common sense and reason."

In *Singleton v. Cuttino,* 105 S. C., 44; 89 S. E., 385, it is said:

"Where one party agrees to do an act, to the satisfaction of another, in an ordinary business transaction, not dependent upon the taste, or upon a fact of a personal nature, and the party to whom the promise is made refuses to accept the work, on the ground that it is not satisfactory, such refusal cannot be sustained, unless it was based upon reasonable grounds."

In *Furman v. Tuxbury Co.,* 112 S. C., 71; 99 S. E., 111, the deed gave the grantee the right "to do any and all other things that may be necessary for the cutting, handling, hauling, and removing of the timber." The plaintiff complained that the defendant had used steam skidders in removing the timber, greatly to the damage of the land and growing timber. The defendant claimed that it had the right to use the skidders, because that was shown to be a convenient method of handling and removing the timber. The Court held:

"We agree with the trial Court that the word 'convenient' must be construed so as to make it harmonize with the other words and provisions of the deed. Therefore it was properly held that the use of that word gave defendant no arbitrary or unreasonable right, but it was intended thereby to give defendant the right to use such means as might be reasonable convenient, suitable, or reasonably adapted to the end in view, having reasonable regard to the plaintiffs' reserved rights."

It was the duty, therefore, of the company, in determining the issue of the insurability of the applicant on Sep-

tember 18, 1918, to exercise a fair, honest, and reasonable judgment.

The parties, however, by contract, having committed to the officers of the company the power to decide this particular issue of fact, *prima facie* that decision was just; the presumption is that it was the result of the exercise of a fair, honest, and reasonable judgment; and the burden upon the plaintiff, attacking that decision, was to show the contrary.

In the case of *Guaranty Co. v. Charles, supra,* the opinion was delivered by the present Chief Justice. Justice Woods concurred in the result, and Justice Hydrick concurred with Justice Woods. Justices Watts and Fraser did not participate. In the opinion of Justice Woods occurs this statement:

"It is an attempt to make one of the parties the final Judge in his own case, of a matter of ordinary business accounting as distinguished from matters of personal fancy, taste, convenience, or preference. At the most such a stipulation cannot be effective further than to make the conclusion of the party in whose favor it is made *prima facie* evidence of the fact of default."

If this be true (and it is the opinion of the majority of the Court participating in the decision), the rejection of the application, upon the ground that, "in the opinion of the society's authorized officers," the applicant was not an insurable risk under its rules, must be taken *prima facie* to have been the result of their honest investigation and decision. The applicant agreed to submit the determination of this question to the officers of the company; they have acted; and, if the plaintiff would override that decision, the burden is upon her to show that the decision was so unreasonable as to amount to a fraud. As it is said in the case of *Thompson v. Insurance Co.,* 63 S. C., 291; 41 S. E., 464:

"The reasonableness of the promisee's action in detrmining th qustion is the eltment entering into the contract, and a

disregard of this element is in the nature of a fraud on the rights of the promisor."

In the case of *Lane v. Insurance Co.*, 142 N. C., 55; 54 S. E., 854; 115 Am. St. Rep., 729, which was a case of reinstatement under a policy provision which required the assurance of good health to be approved by the medical director and president of the company, the application was rejected. The Court said:

"In the absence, certainly, of any showing that the approval of the officers has been fraudulently withheld, and that their denial of the application is purely arbitrary, we do not see why their refusal to reinstate the plaintiff is not fatal to his right of recovery in this action."

Counsel for the plaintiff is mistaken in his conception of the issue in this case. The contention is that the whole matter depends upon the question whether or not Stanton was an insurable risk on the date of the application. That is not the controlling issue. The matter by contract having been left to the decision of the officers of the company, the issue is whether or not they exercised the power conferred upon them, fairly and honestly, or so arbitrarily, capriciously, and unreasonably as to amount to a legal fraud upon the rights of the applicant. Of course, if the applicant at that time was a perfect specimen of physical manhood, as a matter of fact a fit subject of insurance, "an insurable risk," that fact would be one of great weight in determining whether or not the rejection was disingenuous.

Now, considering the rejection of the application, entirely independently of the alleged prevalence of an epidemic of influenza during the month of October, 1918 (which element will be considered later), there is not only an utter absence of evidence tending to show that the company's action was arbitrary, capricious, or unreasonable, but an abundance of evidence that the company exercised its right of rejection reasonably, and according to the best judgment of its officers, in the interest of the stockholders of the

corporation, upon the ground of his past record of intemperance.

It has not been shown by any means that at the time of the application Stanton was a perfect specimen of physical manhood, an insurable risk. The officers, in passing upon his application, had before them the rejected application of 1917 and the report, together with the application of 1918, and the reports in connection with it. Dr. Reese reported in 1917 that Stanton had been drinking *for ten years and at times to excess,* but that he had drunk nothing within the 6 months preceding October, 1917, the date of the 1917 application; that, in his opinion, *Stanton was making a hard fight to overcome the habit.* Mr. Owens, a most reputable member of the Marlboro Bar, reported that Stanton was a drinking man; became intoxicated once or twice a year; would continue in that condition for several days at a time; and had taken the cure for the liquor habit; but that it had been about a year since he had heard of his being intoxicated. Mr. J. B. Tatum reported that Stanton at one time dissipated some; that he did not drink at that time, and had not within the past 6 months; that at that time he was doing finely. These were the reports upon the application of 1917. No complaint was made as to the rejection of that application upon the foregoing showing.

In his application of 1918, Stanton stated that at that time he did not indulge at all in liquor, but that he had, within the past 5 years, used it to the *extent of intoxication;* that in 1914 he had had rheumatic fever and was ill for 6 months; that in 1915 he had been operated upon for hernia; and that he had been "rated up" by the New York Life Insurance Company. Dr. Reese again made a report stating that Stanton had drunk periodically for *years,* but that he had quit, and had not drunk anything since March, 1917; that he *firmly believed* that he had given up the *habit* entirely, and recommended him as first class. Mr. J. B. Tatum again made a report. He stated that in the past

Stanton had exceeded three glasses of whisky or five glasses of beer daily; that he had not been intoxicated for some time; that he had drunk to intoxication in the past; that he had been intoxicated "something like every 3 weeks," and would continue in that condition for a week at a time; that he had been to a hospital for the habit; that his reformation extended back about a year. Col. T. C. Hamer, clerk of Court, and for years clerk of the House, reported that Stanton "used to drink much"; used to drink to excess, but had not done so for about 3 years; that he considered him a good risk.

The applicant admits in his application of 1918 that he had applied for a policy in the New York Life during the year 1917 to 1918; that he had secured a policy for $1,500 in that company; but that he did not receive the policy that he applied for and had been "rated up"; which means that the policy was issued at a higher rate than for a normal person.

With this showing against the insurability of the applicant, can it be said that the plaintiff has established the absolute insurability of Stanton on September 18, 1918? Or, what is most vital, that the evidence has the slightest tendency to show that the officers, in rejecting the application, acted arbitrarily, capriciously, or unreasonably?

Counsel for plaintiff contends that, in passing upon the application of 1918, the officers had no right to consider anything but the condition of the applicant on September 18, 1918. The binding receipt contains no such limitation. The plaintiff relies upon the receipt to establish "a written contract of insurance or to insure," and, of course, must be held bound by the terms of that written instrument. The inquiry as to the insurability of the applicant is therefore wide open, and embraces the entire history of the applicant as affecting this issue, regardless of what transpired in the rejection of 1917. The investigation of the 1918 application confirmed in greater detail the rejection of 1917;

and how the rejection of 1917 for intemperance may condone and obliterate the record upon which that rejection was based, and confine the investigation to the habits of the applicant for the year preceding the application of 1918, is inconceivable.

The company had before it a record of gross inebriety, extending over a period of 10 year's excessive drinking to intoxication as often as once every three weeks, and continuing for a week at a time; the good doctor, manifestly sympathetic, reports:

"In my honest opinion he is making a *hard fight* to overcome *the habit* entirely; a perhaps involuntary disclosure of a firmly fixed *habit* of intemperance, the strength of which was indicated by the *hard fight* to overcome it."

Not even the best friends of the applicant could offer anything more than a hope that he had broken the chains that bound him. A great doctor and a good man of this State, perhaps speaking to his own experience, once said: "A few *suspend;* none ever quit."

There was evidence on the part of the defendant, tending to show that the hazard, in the case of a man with Stanton's record of intemperance, was 2½ times greater than that on the mormal, temperate man.

If instead of one year of abstemiousness the applicant had shown 5 years, it would not have been unreasonable for the company, in view of his past record, to have rejected the application. It is but speaking to common observation that a young man of dissolute habits exhausts in his youth his reserve force that should save him in middle life when the stress of disease comes upon him. The insurance company is entitled to that reserve unimpaired.

It cannot possibly be asserted that, if there had been no epidemic, the company would not have declined the policy, taking into consideration the intemperate history of the applicant; nor can it be asserted that the company would not have "rated up" the applicant by charging a higher premium

on account of that history. It unquestionably would have had the right to do one or the other. There is not a particle of evidence tending to show that the company would have issued a policy, "on the plan and for the amount at the rate of premium applied for," if the epidemic had not been raging. In fact, the evidence is overwhelming that it would not, and would have been entirely justified in rejecting it; certainly there is no evidence tending to show that it acted unreasonably.

But, the plaintiff contends, the insurance company, while rejecting the policy upon the ground of the applicant's prior intemperate history, in fact, rejected it upon the ground that there was at the time a .disastrous epidemic of influenza sweeping over the State. There is not a particle of evidence tending to sustain this contention; a bare suspicion arising from the coincidence of the epidemic and the rejection.

Assuming, however, that the prevalence of the epidemic influenced the action of the company, the interesting question arises whether the company had the right to consider it in connection with the previous history of the applicant; in other words, the issue being the insurability of the applicant at the date of application, did the company, in determining that question, have the right to consider the epidemic which prevailed subsequently thereto? If the application had come before the company upon the very day of its submission, the company would have had the right to consider, in the applicant's then situation (his power of resistance weakened by his habits), the effect of a possible attack of influenza, in the event of an epidemic, and to have passed upon his insurability with reference thereto. When the company did pass upon it, it will be assumed that the epidemic was raging. Upon what ground of distinction shall the company be allowed to consider a *contingent* condition and be denied the right to consider an *actual* one?

It is conceded that, if the applicant had been, according to the exercise by the company of an honest opinion, an

insurable risk at the date of the application, the intervention of the epidemic would not have relieved the company of the obligation to issue the policy; that was the main inducement in securing the binding receipt; to guard against intervening causes of risk to the life of the applicant.   But that is a very different proposition from denying to the company the right to consider the intervening cause, in connection with the past history of the applicant, in determining his insurability at the date of the application.

If, as a matter of fact, the condition of the applicant should render him more susceptible to—less able to resist, an attack of a certain disease which *may* occur, he is none the less an uninsurable risk because no such disease at that time was prevalent, but afterwards became so.

The record for appeal does not show at what time the epidemic assumed alarming proportions; but, according to the contention of the plaintiff that the policy was declined on account of its prevalence, the evidence showing that the declination occurred on October 10, 1918, the plaintiff must admit that the date was somewhere between October 1st, and October 10th; if on October 1st, the company had only 12 days from the date of the application within which to investigate it; surely not an unreasonable lapse of time; and after the prevalence began it would have been impossible for the applicant to have obtained other insurance.

It is insisted by the plaintiff that the company unreasonably delayed action upon the application, and thereby leading the applicant to believe that a policy would be issued, induced him to refrain from securing other insurance which he might and would have done.

In the first place, the evidence does not disclose such an unreasonable delay as would have the effect claimed.   The application unsigned and unfilled-out was forwarded by Roddey to the local agent on September 16th; it was signed on September 18th; immediately forwarded to Roddey, who

forwarded it to the Atlanta office; the latter began investigation on September 19th; application and medical report received by New York office September 21st; Tatum's report September 24th; request of report from Hamer October 4th; Hamer's report October 5th; submission to medical directors October 10th; declined October 10th; notification to Roddey October 11th; notification by Roddey to local agent of declination October 19th (due to demoralization of office force by influenza) ; death of Stanton October 21st; notfication to him delayed by absence of local agent, who did not receive Roddey's notification until after Stanton's death.

Stanton was taken sick on October 12th. He certainly could not have obtained other insurance after that date. The delay at most, therefore, was from September 18th to October 11th, 23 days. In a transaction involving $25,000 insurance that cannot be considered an unreasonable delay or even the evidence of it.

In 1 Joyce, Insurance (2d Ed.), § 57, it is said:

"There is, as we have seen, no obligation resting upon the insurer to accept a proposal or application for insurance, and therefore delay in acting thereon will not in itself warrant a presumption of acceptance."

The author cites an Alabama case in which—

"a receipt was given by an agent, reciting that the applicant was to be considered insured from date of said application shall be approved and accepted by said company. After several weeks the application was rejected, and it was held that no acceptance could be implied from such delay even though the note for the premium was not surrendered; it not appearing that the agent claimed the power to contract." *Insurance Co. v. Mayes,* 61 Ala., 163; *New York Union Mut. Ins. Co. v. Johnson,* 23 Pa., 72; *Ross v. N. Y. Life Ins. Co.,* 124 N. C., 395; 32 S. E., 733. *Misselhorn v. Insurance Co.* (C. C.), 30 F., 545.

Even if the delay was unreasonable, that cannot be construed into an acceptance of the application.   14 R. C. L., 896; *Heiman v. Phœnix Mut. Life Ins. Co.,* 17 Minn., 153 (Gil. 127), 10 Am. Rep., 154; *McLendon v. Woodman,* 106 Tenn., 695; 64 S. W., 36; 52 L. R. A., 444; *N. W., Mut. Life Ins. Co. v. Neafus,* 145 Ky., 563; 140 S. W., 1026; 36 L. R. A. (N. S.), 1211, and note Cooley's Briefs, 426; *Gonsoulin v. Equitable Life Ins. Co.,* 152 La., 865; 94 So., 424.

Furthermore, it appears that during the period between the two applications the decedent applied for and obtained a policy from the New York Life Insurance Company but had been "rated up" by that company, which refuses the probability even that he could have obtained from any company a policy like that applied for.

The judgment of this Court should be that the judgment of the Circuit Court be reversed, and that the case be remanded to that Court for judgment of nonsuit under Rule 27.

MR. ACTING ASSOCIATE JUSTICE MARION concurs.