### 20172

Margaret VERNON, Administratrix of the Estate of Andrew P. Gary et al., Respondents, v. PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY, Appellant.

(222 S. E. (2d) 501)

---

*Messrs. Turner, Padget, Graham & Laney,* of Columbia, *for Appellant,*

*Messrs. John A. Martin,* of Winnsboro, and *Richard M. Kennedy,* of Columbia, *for Respondent,*

*Messrs. Turner, Padget, Graham & Laney,* of Codlumbia, *for Appellant,* in Reply.

February 19, 1976.

LITTLEJOHN, Justice:

Plaintiffs, as beneficiaries, brought this action to recover the proceeds of a life and accident insurance contract, allegedly procured by the decedent, Andrew P. Gary, from defendant Provident Life and Accident Insurance Company (Provident), which denied the existence of the contract and any liability on its part.

Upon trial of the case, the jury returned a verdict for plaintiffs. Provident has appealed, alleging as error the failure of the trial judge to grant its motions for nonsuit, directed verdict, judgment n. o. v., and for a new trial.

It also alleges error in the admission of certain evidence and in the charge to the jury. After consideration of the record, we overrule Provident's exceptions and affirm the verdict below.

A careful review of the facts is necessary for an understanding of the issues.

On March 14, 1974, decedent executed an application for one hundred twenty-five thousand dollars ($125,000) life and accident insurance with Provident. He was solicited by an independent broker (agent for Provident), who had previously arranged insurance with another company for decedent. Because this previous insurance had lapsed, the broker suggested decedent apply for a policy with Provident, and recommended the plan and amounts for which application was made.

On the date the application was made, decedent paid the first month's premium of $87.85, which is the standard premium for a man his age and size, for which he received a conditional receipt. This receipt was for coverage from March 14, 1974 to April 14, 1974. It read in part as follows:

"BY ACCEPTANCE OF THIS RECEIPT THE HOLDER AGREES AS FOLLOWS:
"If both of the following conditions precedent are fulfilled:
"(a) if the medical examinations, if any required by the Company are completed; and

"(b) if the Company is satisfied after such investigations and such medical examinations as it may require that the Proposed insured is on the date of the application insurable and qualified under the Company's rules and standards for insurance exactly as applied for in Question 4 of the application which bears the same number as this receipt and at standard premium rates,
then said insurance shall take effect and be in force subject to the provisions of the policy applied for from the date of

the application. Unless both of the conditions precedent are fulfilled, no insurance shall be in force under this receipt and the only liability of the Company shall be to return this payment in the form of the Company's check upon surrender of this receipt."

There is no contest relative to condition (a); Provident rejected the application under condition (b) after the applicant died.

On March 15, 1974, Dr. Harold Miller, a physician selected by Provident, examined the decedent and conducted tests called for in the medical portion of the company's application form. He unreservedly recommended the applicant (decedent) as a first class risk for insurance, with the added notation, "However, he does have a rapid heart rate."

On March 18, 1974, decedent's application, medical report, and premium payment were forwarded by mail to Provident's home office in Tennessee. On March 19, 1974, decedent was killed in an automobile accident. The application and allied papers were received at Provident on March 20, which was one day after applicant's death.

Soon after March 20, Provident undertook an investigation to determine whether it should accept the application, and thus be liable immediately for $125,000 on the insurance contract, or reject the application and return the first month's premium in the amount of $87.85. It sent to the Columbia area Conard L. Heath, a former F.B.I. agent, to make an investigation in reference to the decedent, for the purpose of helping the insurance company to process the application. He filed a 12-page report, after which Provident rejected the application, "in view of the significance of his [decedent's] past health history . . .".

This action ensued.

In the life insurance business, there are in use various forms of binding receipts which at least conditionally afford an applicant interim coverage be-

tween the date of the application and the actual issuance and delivery of the policy. Such binding receipts have been the source of a great deal of litigation. In determining whether interim coverage is afforded by a particular receipt, the specific language of the receipt must be taken into account. Liability of the insurer, if any, is dependent upon the language of the receipt, the facts of the particular case and the intention of the parties.

An interesting discussion on the subject is to be found in 43 Am. Jur. (2d) *Insurance* Sec. 220 *et seq. Also see* 2 A. L. R. (2d) 936, and *Brown v. Equitable Life Ins. Co. of Iowa,* 60 Wis. (2d) 620, 211 N. W. (2d) 431 (1973).

The practice of some companies in providing in their applications that the contract of insurance shall not take effect until the application has been approved by the company, the first premium paid by the applicant, and the policy delivered, has substantial advantage. It eliminates misunderstandings and law suits. On the other hand, there are advantages to both the insurance company and the applicant in providing coverage from the moment the application is signed and the initial premium paid to the company's agent. The applicant has the advantage of immediate insurance coverage. He normally feels that he is obliged to accept the policy upon delivery and pay the premiums required thereafter. The advantage to the insurance company is in the fact that the applicant is not likely to shop around for other coverage and renege on his contract.

The law of averages dictates that occasionally persons will die after the application and before the issuance of the policy. Human nature dictates that the insurance company will pursue every facet of the "binding receipt" and protect its rights to the fullest.

It is plaintiff's basic contention that decedent complied with the conditions precedent for insurance from the date

of the application and that Provident arbitrarily and unreasonably rejected the application after it learned of the death.

Provident basically contends that the decedent made false representations to the physician who completed the medical portion of the application, thus influencing his recommendation. It further argues that decedent was not insurable at standard rates on the date of the application according to the company's rules and standards.

While alleging, in its answer, that the decedent gave false answers in the application and made false representations relied upon by the physician in making his report, it does not contend that it may avoid the contract solely because of such answers and representations. The answer of Provident alleges that the decedent "on the date of the application, was not insurable and qualified under the Company's rules and standards for insurance exactly as applied for in Question 4 of the application at the standard premium rates." Question 4 and its answer set out the plan of insurance and the amounts.

The receipt upon its face appears to lodge with Provident an almost arbitrary power to decide whether the decedent was on March 14, 1974, insurable under its "rules and standards for insurance." Parties may contract to leave such decision to one of the parties, but the law requires that in making the decision the party who is vested with the power of decision must act fairly, honestly and reasonably, and that the other party will not be bound by that decision when it is shown that the power of decision has been exercised arbitrarily, capriciously and unreasonably. In such a case, not involving matters of personal taste and convenience, neither party has the arbitrary right to decide the existence of a particular fact upon which the obligation of the contract depends.

The judge, in his charge, set out the real issue before the court:

"The issue for your determination in this case is whether or not the action of the insurance company, Provident, in rejecting this particular application under the terms of this particular receipt which is binding upon the parties, was exercised arbitrarily, capriciously, and unreasonably. If so, the Plaintiffs are entitled to recover. If not, the Defendant is entitled to a verdict."

It is the contention of Provident that the judge should have held as a matter of law that it did not act arbitrarily, capriciously or unreasonably, and should have granted the motions for a nonsuit, a directed verdict for judgment notwithstanding the verdict.                          . .

It should be noted that the receipt prepared by Provident provided that the company must be "satisfied . . . that the Proposed insured is on the date of the application insurable and qualified *under the Company's rules and standards* for insurance." (emphasis added.) In order to determine whether Provident acted fairly and reasonably, one needs to refer to those rules and standards. Rejection or acceptance of an application under one set of rules and standards might be fair and reasonable, but might be unfair under another set of rules and standards. Provident is in the uncomfortable position of having no identifiable rules and standards, even though the receipt refers to "the Company's rules and standards." In the trial of the case, Mr. Owen C. Lesslie, Jr., Assistant Vice President of Provident's Life Department, admitted that the company had no rules and standards of its own. He said that his company used standards of Lincoln National Life, of Connecticut Life General, and of North American Reassurance Company of New York.

When questioned about his company's rules and standards and the use of underwriting manuals of other companies, Mr. Lesslie testified as follows:

"Q. In performing your underwriting duties with particular respect to the application of Andrew P. Gary which we are concerned with in this lawsuit, did these manuals play any part in that underwriting?

"A. As far as referring to them specifically when the information was developed, no, but as far as having practical knowledge of their content, yes, they did.

"Q. Are these the rules and standards that govern the underwriters of Provident Life and Accident Insurance Company?

"A. Not govern, but to be used as a guideline.

"Q. This is part of your overall knowledge?

"A. Yes, it is part of the learning process and it's part of the reference process.

"Q. In those manuals, are there portions that relate in this instance to heart disease, chest pains, and things of that nature?

"A. Yes."

We think it inescapable that Provident got ideas, or guidelines, from the manuals, or rules and standards, of other companies, and in acting upon each application decided which rules and standards would be referred to most. Provident placed in evidence portions of the rules and standards of other companies, but at no time did it even attempt to identify any rules and standards as its own, as referred to in the conditional receipt. This gave to Provident a flexibility of decision in each case.

This Court has considered the effect of conditional receipts in several cases. *Hamrick v. Life and Cas. Ins. Co. of Tenn.*, 252 S. C. 108, 165 S. E. (2d) 567 (1969); *Hyder v. Metropolitan Life Ins. Co.*, 183 S. C. 98, 190 S. E. 239 (1937); *Stanton v. Equitable Life Assur. Soc. of U. S.*, 137 S. C. 396, 135 S. E. 367 (1926).

The facts in *Hamrick, supra,* were quite similar to the facts in the present case. There, we accepted the general

principle of law, quoting from 29 Am. Jur. Insurance § 210, at 600, that although the insurer may have reserved to its satisfaction the determination of whether the applicant was an insurable risk on the date of the application, it must make its determination in *good faith*. We held that a jury question arose as to whether the insurer's action was reasonable and honest.

We now return to the basic question: Should the judge have held, as a matter of law, that Provident acted fairly and reasonably, and granted a nonsuit, directed verdict, or judgment notwithstanding the verdict?

As indicated hereinabove, Provident was required to act with good faith in making the determination. The prime consideration in acting upon the decedent's application should have been: What was the decedent's state of health at the time of the application? Provident's right to reject the application hinges on this question.

When Provident's investigator, Mr. Heath, came to South Carolina, he discovered that answers given by the decedent on the medical portion of the application were false. He had given a negative answer when asked if he had been a patient in a hospital within the last five years. Actually, he had been hospitalized two years previously, for three days, complaining of chest pains. Dr. Warren Irvin, Jr., a heart specialist, attended him. His regular family physician was Dr. W. E. Gause. The investigator procured the hospital records incident to his hospitalization. The admission note, based on the history given by the patient, indicated that he was admitted because of severe chest pains radiating into his jaw and mouth. It showed that he had taken some nitroglycerine, "which he happened to have." The admission note indicated that "for 2 or 3 years, 2 or 3 times a year, he has had severe chest pains in his left anterior chest, shoulder and radiating into his left arm." It further said, "No one has ever figured out what this pain was, but he was given nitroglycerine by telephone on one occasion to

use for it. This was the reason that he had it." During his stay at the hospital, he had several electrocardiograms, all of which were normal and none of which indicated heart disease. He was dismissed on the third day and returned directly to his office to work. There was no recommendation that he limit his activities. Dr. Irvin's discharge note read in part as follows: "The patient was asymptomatic by the time he got to the CCU and remained asymptomatic throughout the remainder of the hospitalization." The doctor's final impression was: "Chest pain with syncopal episode, etiology unknown." The patient was to come back in two weeks for further tests. He did return in two weeks, and took an additional electrocardiogram test, which was normal. From that time until the time of his death, a period of about two years, there is no evidence of any health problem, or any evidence detrimental to the decedent, healthwise.

The entire hospital record was introduced in evidence. In addition a letter from Dr. Julian C. Adams to the decedent's family physician, Dr. Gause, dated September 10, 1971, was made an exhibit. Apparently, Dr. Gause had referred the decedent to Dr. Adams, a specialist in neurology. The letter stated, "I could find no evidence of organic neurological disease. . . . I believe Mr. Gary has been working much to hard during the last few months and I think many of his complaints are secondary to his fatigue." In summary, the letter reveals that the findings were negative.

Mr. Heath's investigation of the decedent's personal and medical history went as far back as the 1950's, including his veteran's records. It is inferable that his findings were negative, since his testimony on direct examination was merely to introduce (1) the hospital records, (2) patient's chart, and (3) Dr. Adams' letter. Mr. Heath did not talk to those three persons who should have been able to give him more information relative to the decedent's health than any other persons. They were Dr. Irvin, Dr. Gause, and

Dr. Adams. He testified that he went to see Dr. Gause, but he was out of the office at the time because of his father's death. He did not pursue the interview, but said that he left it up to his company to decide whether they would contact Dr. Gause further. Apparently, no further contact was made with Dr. Gause. He went to see Dr. Adams, but Dr. Adams was out of town. He made a request of his office, apparently, for the letter which was introduced in evidence, but did not return to see Dr. Adams.

Apparently, he did not talk with Dr. Irvin, but did procure from his office records referred to hereinabove.

All of the evidence indicates that decedent enjoyed good health and worked regularly. Provident rejected the application solely on the basis of the history found in the hospital admissions chart, which came from the decedent himself. On cross-examination, Dr. Bruce F. Grotts, medical examiner for Provident, who reviewed the entire record and recommended rejection of the application, testified as follows:

"Q. And is it not true, sir, that every other factor you had to consider other than his own statement on admission was favorable to good health, every other factor from every other medical source including electrocardiograms, the physical examination, weren't they indicative that this man was in good health all but the verbal statement given on admission?

"A. That's correct."

It is the contention of Provident that it was justified in rejecting the application because of a manual of another insurance company, which suggests that a person with chest pains should be rated the same as a heart disease patient. That manual also attaches significance to the use of nitroglycerine. A more thorough investigation on the part of Mr. Heath, with the doctors, might have revealed that nitroglycerine had never been prescribed for the decedent. The

nitroglycerine which he had taken was from a prescription of his mother.

In determining whether the judge erred in failing to grant the motions of Provident and rule as a matter of law that it acted fairly and reasonably, and in good faith, we are not concerned with the weight of the evidence. When reasonable persons may disagree, it becomes the duty of the trial judge to submit the issue to the jury. Failure to have identifiable rules and standards at the time the receipt was issued, failure to pursue those doctors who might have given pertinent information, and treating chest pains the same as heart disease in the absence of Provident's own identifiable rules and standards so providing, is evidence of bad faith and raised a jury issue as to whether the application was processed fairly and reasonably under the circumstances. We cannot say, as a matter of law, that the evidence created only one reasonable inference, and accordingly, we hold that the motions were properly denied.

Provident submits that at the nonsuit stage, plaintiffs had not proved that its actions were unreasonable and unfair. At that point, plaintiffs had in evidence the application, the payment of the first month's premium, the conditional receipt, the death of the applicant and the rejection of the claim by Provident. There was also evidence creating the inference that decedent was in good health on the date of the application. This is all that was required of plaintiffs at that point. Plaintiffs could hardly be expected to prove that Provident's actions were unfair and unreasonable under its rules and standards, when none actually existed.

Having decided that jury issues were involved in this case, we proceed to consider Provident's exceptions addressed to the proposition that a new trial should be granted. Plaintiffs were permitted to present reply testimony of two witnesses. Decedent's mother was permitted to testify that nitroglycerine had been prescribed

for her and that she had permitted her son to take an unused portion of the prescription, which he used to relieve muscle spasms. We find no error. Provident's vice president, Mr. Lesslie, and its medical director, Dr. Grotts, had previously testified that they placed emphasis on the hospital admission note which indicated that the decedent had taken nitroglycerine for relief. This was a fair subject on which to offer rebuttal testimony, especially in light of the fact that Provident's investigator, Mr. Heath, had not conferred with the medical doctors who had treated the decedent.

Mr. Clyde Green, an experienced underwriter for another company, was allowed to testify under a hypothetical fact situation, that he would have recommended acceptance of the application. Although this testimony may have been more properly given during plaintiffs' case in chief, there was no abuse of discretion in allowing this rebuttal testimony. *See* West's South Carolina Digest, Vol. 18, Trial, Key 63(2).

Provident further attacks the testimony of Mr. Green, contending that the hypothetical question asked by counsel, and on which his answer was based, was inaccurate, as he was not told to assume that his company's medical director had recommended rejection. We find no error. Mr. Green had heard all of the testimony. The question concerned what an underwriter would recommend. On cross-examination, Provident's counsel was permitted to inject what effect a medical director's recommendation would also have.

Mr. Green's testimony was relevant on the issue of whether the company acted fairly and reasonably. The fact that this witness did not have authority to approve such a risk, and the fact that he would not have approved such a risk over the objection of his medical director, does not affect the admissibility of the evidence, but goes to the weight.

Provident's final exception relates to the trial judge's instructions to the jury concerning Code Section 37-451, which was charged.

At the end of the charge, Provident's counsel objected to this statute, whereupon the judge told the jury to disregard it. Counsel now contends that the jury had no way of knowing what language the court was instructing them to disregard. In the charge in chief, the judge made this statement, "In connection therewith, we may charge you section 37-451 which pertains to accident policies." No other statute was charged. In withdrawing the charge at the request of Provident's counsel, the judge said, "Mr. Foreman, ladies and gentlemen of the jury, we read one statute to you, Section 37-451 of the Code, please disregard that Statute." We find no error in the judge's handling of this issue.

Affirmed.

LEWIS, C. J., NESS and RHODES, JJ., and JOSEPH R. Moss, Acting Associate Justice, concur.