2526

Frank Charles KRAMER and Susan G. Kramer, Appellants v.
Sharon Marcel Marsett KRAMER, Respondent.

(473 S.E. (2d) 846)

Court of Appeals

*David Armstrong* and *J. Falkner Wilkes*, Greenville, *for appellants.*

*Susan Cobb Singleton* and *Dianne S. Riley*, Greenville, *for respondent.*

Heard May 8, 1996.

Decided July 1, 1996; Rehearing Denied Aug. 22, 1996.

*Per Curiam:*

In this action for child custody, Frank Charles Kramer and Susan G. Kramer appeal the decision of the family court judge awarding custody of Daniel Ray Kramer to Sharon Kramer (Mother), the child's biological mother, after the death of the child's father, Ray Kramer (Father). We reverse.

## FACTS

Mother and Father entered into a common law marriage in or about September 1987. On June 3, 1989, Daniel Ray Kramer was born to the parties. One June 1, 1990, Mother left Father and Daniel, taking Robert Kendrick, her child from a previous relationship, with her. On June 8, 1990, Father filed an action for custody of Daniel. Mother failed to answer, and Father received permanent custody of Daniel.

Father was killed on October 12, 1993. Following his death, Frank and Susan Kramer, the child's paternal aunt and uncle, commenced this action for custody of Daniel. The Kramers alleged they had been caring for Daniel before his Father's death, and Mother had visited Daniel only very sporadically during the child's life. Mother answered and counterclaimed for custody of Daniel. The family court judge awarded custody of Daniel to Mother. Frank and Susan Kramer appeal.

### I.

The Kramers initially argue the family court judge erred in excluding their rebuttal witness, Kathy Miller. We agree. Although we reverse the family court

judge's custody order on other grounds, we address this issue because of its importance to the family court bench and bar.

At the time of the custody hearing Mother had remarried. In her order awarding custody to the Mother, the family court judge emphasized the importance of the role of Mother's new husband, Lee Wooster, to Mother's family unit, stating:

> I also find that the biological mother's husband, Lee Wooster, is the biological father of Defendant's two youngest children. I observed his demeanor and testimony when presented and found him to be very supportive of Defendant's attempt to regain custody. I find him to be, by all testimony presented, a positive influence on both the biological mother and the family unit. I find that he is gainfully employed and that he has developed a bond of love and affection with all three of the minor children in his present household and that he has a willingness and desire to assist Daniel in his transition into his household. Although, Plaintiffs have made an issue of Mr. Wooster's interaction with a child from a previous relationship (sic). Moreover, I find that [the] only relevant issue as to Mr. Wooster in the instant case is as to what type of willingness he has to provide financial and daily support for this child in his home environment in Georgia.

Moreover, the family court judge acknowledged Mother's financial dependence on Wooster stating, "The Court does have concerns about the mother's long-term stability because [the] Court is mindful of the fact that the mother's financial security is, in large measure, dependent upon the new husband's job and income." As a result, the judge encouraged the Mother to obtain additional technical training or education so that "her future stability can be maintained in the event of an unexpected accident, illness, job lay-off, or marital discord" involving her new husband.

On direct examination, Lee Wooster testified he was committed to helping his wife care for Daniel. Wooster also testified that based on his and Mother's combined income, they had the financial ability to care for another child. On cross-examination, Wooster admitted to having a child in Nebraska from a former marriage. When asked on cross-examination if he was supporting that child he responded, "At this moment, I am

not. I would like to and that particular part is being taken care of through another attorney." When questioned further whether he was presently contributing to the support of that child he answered, "Not with my satisfaction, no, I am not." Wooster admitted he had not seen the child in seven years and indicated that an action was pending in Nebraska to resolve the issues. On cross-examination, Mother was also evasive in her answers when questioned whether she knew if Wooster was supporting his child in Nebraska.

This custody trial continued for three days, October 19, October 20 and December 12, 1994. On the third day of trial the Kramers attempted to call Wooster's ex-wife, Kathy Miller, as a reply witness. Miller was not contacted to serve as a witness until after Lee Wooster's testimony on the second day of the hearing. The family court judge would not allow Miller to testify because she had been located as a witness in the interim period between the second and third day of the trial. The judge stated:

> Let me tell you the reason for my rule that lawyers will turn in the names of witnesses whenever a case has to be continued. The purpose of that rule is to not allow just what you've gone and done. You've gone out and done some more work and you've bolstered your case only because you got the advantage of the fact that there was a delay in this trial. Had we scheduled this trial for enough time, had you two lawyers scheduled this case for the proper amount of time on the first hearing day, you would not have had an opportunity to do all that, Mr. Armstrong, and you wouldn't have done it.

The family court judge thus refused to permit Ms. Miller to testify based upon her own "rule" that prevented the calling of a new witness who had been located during the time between the last day of trial and the resumption of the hearing. Initially, the family court judge denied counsel's request to proffer her testimony. Thereafter, following considerable urging by Appellant's counsel, she allowed the testimony to be proffered but refused to remain in the courtroom, leaving her deputy in charge.[1]

---

[1] We note that Rule 43(c), SCRCP, permits an attorney to make a proffer of evidence which the trial judge excludes. This rule applies to both jury and

According to Kathy Miller's proffered testimony, Lee Wooster had been ordered to pay child support for the child of their marriage but had failed to do so. She also testified he was $16,571 in arrears on his child support obligation and had not seen the child in seven years. Miller further stated there was no pending action involving the child in Nebraska, as Wooster had testified. Finally, Miller also testified Wooster was physically abusive to her and abused drugs during their marriage.

We recognize that the admission of reply testimony is within the discretion of the trial judge. *Vernon v. Provident Life & Accident Ins. Co.*, 266 S.C. 208, 222 S.E. (2d) 501 (1976); *McGaha v. Mosley*, 283 S.C. 268, 322 S.E. (2d) 461 (Ct. App. 1984). Further, the rules of discovery were designed to promote the full examination of all relevant facts and issues and to discourage litigants from surprising one another through the introduction of unexpected testimony. *Hodge v. Myers*, 255 S.C. 542, 180 S.E. (2d) 203 (1971); *McGaha, id.* In order to encourage compliance with discovery rules, trial courts con impose sanctions upon parties who violate them, including the exclusion of witnesses whose identities have been withheld. *E.G., Duke v. Westvaco Dev. Corp.*, 279 S.C. 464, 309 S.E. (2d) 293 (Ct. App. 1983); *McGaha, Id.*

Exclusion of a witness, however, is a severe sanction which should be imposed only after the court inquiries into (1) the type of witness involved; (2) the content of the evidence to be presented; (3) the nature of the failure to identify the witness; and (4) the degree of surprise to the other party. *Brandi v. Brandi*, 302 S.C. 353, 359, 396 S.E. (2d) 124, 127 (Ct. App. 1990).

In her order awarding custody to the Mother the family court judge placed much emphasis on Wooster's emotional and financial commitment to the family. Miller's proffered testimony thus would have been very relevant to Wooster's ability and desire to care for Daniel. Moreover, in child custody cases, the best interests of the child are paramount. Finally, Miller's testimony should not have caused any unfair surprise to the mother since Lee Wooster obviously knew his ex-wife and could anticipate the nature of her testimony.

---

nonjury matters. There is no provision under the rule for the judge to leave the courtroom during the proffer.

We appreciate the family court judge's attempt to maintain a level playing field between the parties during a delay in the trial. However, there was no evidence in the record that any discovery orders had been violated by the Kramers' failure to disclose a witness prior to trial; the family court judge referred only to her own "rule" in denying the testimony of Miller. Under these circumstances, the exclusion of the witness was an abuse of discretion amounting to an error of law.

## II.

The Kramers argue the family court judge erred in granting custody of the minor child to the mother. We agree.

The Supreme Court has established certain criteria to be used by the family courts in making custody determinations when a biological patent seeks to reclaim custody of a child. They are:

(1) The parent must prove that he is a fit parent, able to properly care for the child and provide a good home.
(2) The amount of contact in the form of visits, financial support or both, which the parent had with the child while (he or she) was under the care of a third party.
(3) The circumstances under which temporary relinquishment occurred.
(4) The degree of attachment between the child and the temporary custodian.

*Moore v. Moore*, 300 S.C. 75, 79-80, 386 S.E. (2d) 456, 458 (1989).

Applying the *Moore* factors to this case, we find the trial judge erred in transferring custody to the mother. Under our view of the preponderance of the evidence, we do not believe that Mother is a fit parent able to provide a good home for Daniel.

Mother's first child, Robert, was fathered by a man to whom she was not married. Her second child, Daniel, the subject of this action, was fathered by Ray Kramer with whom she had a common law relationship. Mother left both Ray and Daniel on Daniel's first birthday. She lived with her mother in Texas for approximately five months and then moved to Atlanta, Georgia, where she lived with the father of her older son. After leaving him she resided in several other places until

she moved in with her boyfriend, Lee Wooster. She and Mr. Wooster had two children together. Only after the Kramers brought this action did Mother marry Mr. Wooster.

At the time of trial Mother was financially defendant on Lee Wooster. He testified to his commitment to her and the children, both emotionally and financially. The family court judge found him to be a "positive influence" on Mother and the family unit. The finding, however, is questionable in light of the proffered testimony of Wooster's ex-wife.

Under our view of the preponderance of the evidence, we do not believe that either Mother's past conduct nor her present situation with Mr. Wooster establishes her as a fit parent, able to properly care for the child and provide a good home for him. Given Lee Wooster's child support arrearage of over $16,000, he is not in a position to provide financial support to Daniel. The mother has a history of instability and financial dependence on others. Considering Mr. Wooster's situation, we do not believe her marriage to him carries with it the positive connotations found by the trial judge, who ruled without the benefit of hearing the reply testimony.

Considering the second *Moore* factor, Mother's contact with Daniel during the four years following her departure was minimal. She defaulted in the custody action brought by Father shortly after her departure. The order which emanated from that action provided she was not to remove Daniel from the State of South Carolina until she had applied to the family court to establish visitation. Despite this language in the order, Mother never petitioned the family court for visitation rights. She saw the minor child only once or twice per year. She also failed to send Christmas presents to Daniel or to provide financial support for him. When Father died, the Kramers went to considerable trouble to find Mother, finally locating her through social security records. Quite obviously, Mother had not kept the Kramers apprised of her whereabouts or made any attempt to contact Daniel during the previous Christmas holidays. Only when the Kramers initiated this action for custody did Mother request custody of Daniel.

Although Mother testified she was unable to visit Daniel because of her fear of Father, this was not corroborated. Moreover, there is no indication in the record that Mother ever sought protection from the family court or law enforce-

ment. If indeed Mother was fearful of Father because of his physical abuse of her or his drug use, this is inconsistent with her conduct in leaving Daniel in his care and making no effort to regain custody of him for over three years.

The guardian ad litem in this case testified that Mother's actions evinced a "lack of interest" in Daniel for the last several years. Regardless of whether her conduct was precipitated by her fear of Father or her own lack of interest, Mother's contact with Daniel and her contribution toward his support was minimal, at best, for a period of $3\frac{1}{3}$ years. These facts are very different from the circumstances in *Moore* where the biological father's contact and financial support were limited by the other litigants who had temporary custody of the child.

The third *Moore* factor, the circumstances under which temporary relinquishment occurred, is also not in Mother's favor. As noted, she left Daniel with his father on Daniel's first birthday, moving to Texas where she failed to contact him for many months. She also failed to answer the custody proceedings commenced by Father. Quite simply, she pursued a life of her own, showing little or no regard for the well-being of her young son. Mother's relinquishment of custody is thus markedly different than that presented in *Moore* where the biological father accepted an offer of assistance from the caretakers because of his responsibilities to his four other children and due to his serious injuries in an automobile accident.

Finally, the degree of attachment between the child and the Kramers also militates against an award of custody to the Mother. All the evidence presented on the Kramers behalf, as well as the testimony of the guardian ad litem, supports the strong emotional bond between Daniel and the Kramers. Even during the time Father had legal custody, the Kramers were acting as Daniel's parents. The guardian ad litem described the Kramers as the only mother and father Daniel had known since his mother left on his first birthday.

We agree with the guardian that Daniel's best interests would be served by him remaining with the Kramers.

While a presumption exists in favor of a biological parent over third parties in a custody dispute, that presumption is rebuttable. *Moore v. Moore, id; Kay v. Rowland*, 285 S.C. 516, 331 S.E. (2d) 781 (1985). We believe that under the facts

of this case, the presumption was rebutted and that custody of Daniel should have been awarded to the Kramers.

Therefore, we reverse the order of the family court judge granting custody to Mother and grant custody to the Kramers. This decision is based upon the record before us, and does not take into account anything which has transpired since Daniel was placed with his mother. Mother may, of course, petition the family court for custody based upon a change in conditions since the prior decree.

Reversed.

HOWELL, C.J., and CONNOR and HEARN, JJ., concur.