633 S.E.2d 162

**Kenneth MIDDLETON, Appellant,**

**v.**

**Elizabeth Ann JOHNSON and Eugene Hollington, Respondents.**

**No. 4108.**

Court of Appeals of South Carolina.

Submitted March 1, 2006.

Decided April 24, 2006.

Revised June 28, 2006.

Rehearing Denied July 5, 2006.

Daphne A. Burns, of Mt. Pleasant, and Margaret D. Fabri, of Charleston, for Appellant.

Elizabeth Johnson McCants, of Florence, and Eugene Hollington, of Warner–Robbins, GA, no appearance.

HEARN, C.J.:

Kenneth Middleton appeals from an order of the family court denying him visitation with Joshua Hollington, a minor child. Although Middleton admits he is not biologically related to Josh, he argues he is entitled to visitation because he served as Josh's "psychological parent" for ten years and because visitation is in Josh's best interest. We reverse and remand.

## FACTS

Middleton and Elizabeth Johnson (Mother) had a long-term relationship from 1979 until the early 1990s. At the time they met, Mother had two small daughters: a four-year-old named Chelsea and a one-year-old named Tenille. Middleton also had two daughters; his older daughter, Andrea, was eleven, and his younger daughter, Kenisha, was four. While Mother dated Middleton, she and her children spent Thursdays through Sundays at his home. Middleton, with Mother's encouragement, developed a strong, parental relationship with both Mother's daughters. He supported the two girls financially and emotionally, and even though they are now grown,

he still considers them his daughters. In fact, when Chelsea married, Middleton escorted her down the aisle despite the fact that her biological father attended the wedding.

By 1992, Mother and Middleton were no longer in a serious relationship; however, they had an intimate encounter in July of that year. Nine months later, on April 7, 1993, Joshua Hollington was born. During Mother's pregnancy, she told Middleton that Eugene Hollington was the father of her child. However, after Josh's birth, Mother called Middleton and told him he needed to see Josh, and she sent a photograph to Middleton when Josh was three months old. The implication was that Middleton was Josh's father because the resemblance between Josh and Middleton was so striking.

Once Middleton saw the photograph and the physical similarity between Josh and himself, he showed the picture to various family members and friends. They all thought, as did Middleton, that Josh and Middleton were biologically related. Subsequently, Middleton went to his doctor to have a blood test performed, and the test did not exclude him as Josh's biological father.

Beginning when Josh was three months old, Middleton took an active role in Josh's life. He regularly spent time with Josh and supported him financially. When Josh was approximately one year old, a DNA test revealed Eugene Hollington to be Josh's biological father. By that time, Middleton testified he was already committed to being Josh's father, and with Mother's blessing, Middleton continued to love and take care of Josh as though he were a son. When Josh was three, Mother lived in a home owned by Middleton that was next door to Middleton's father's house. Middleton checked on his father daily, and nearly every time Middleton was at his father's house, Mother sent Josh over to visit. Often, Middleton would take Josh home to spend the night.

When Josh began preschool, Middleton and Mother shared the costs. Middleton signed Josh's report cards and picked Josh up from preschool at least three days per week. Essentially, Middleton and Mother had a joint custody arrangement, with Mother caring for Josh Mondays through Wednesdays and Middleton keeping Josh the remainder of the week.

This joint custody arrangement was interrupted briefly when Josh was approximately four years old, and Mother moved in with her boyfriend. At that point, Mother attempted to stop Middleton from seeing Josh because her boyfriend did not like Middleton's presence in their lives. This was resolved when Middleton offered to pay Josh's entire daycare expense, at which point, his normal Thursday through Sunday visitation schedule resumed.

When Josh started public school, Middleton, without Mother, took Josh to his first day of kindergarten. Josh's teachers from second, third, and fourth grades testified that they all believed Middleton was Josh's biological father. Even on the days when Josh did not spend the night with Middleton, Middleton would drive him to school in the mornings. He also picked up Josh nearly every day after school, and he attended PTA meetings, open houses, field trips, and other school-related activities. The teachers acknowledged Middleton as Josh's father in front of Mother, and Mother never corrected them. Middleton also enrolled Josh in the Boy Scouts and in a basketball league. Josh's basketball coach testified that Josh referred to Middleton as "my dad," and Middleton took Josh to every practice and game.

When Josh was in third grade, Mother began to date John McCants. As the couple became more serious, Mother called Middleton and stated McCants did not want Josh at Middleton's house every weekend. To accommodate her boyfriend, Mother came up with a schedule where she and Middleton rotated days every week. By this point in time, McCants was living with Mother, and eventually the two married.

As part of the rotating schedule, Josh spent Christmas of 2002 with Middleton and New Year's Eve with Mother. According to the visitation schedule, Josh was to return to Middleton's house on January 1, 2003; however, Mother called Middleton that day and explained that she was not going to bring Josh over because he had been acting up, and she had to punish him. When Josh came over the following day, he hugged Middleton and told him that Mother had left marks on him by hitting him with a studded belt. Josh showed Middleton the marks on his upper thighs, near his groin area.

Middleton testified that he had previously observed signs of physical abuse and that he had spoken to Mother about hitting Josh. Middleton was concerned that if he reported this suspected abuse, Mother would forbid him from seeing Josh. Because Middleton did not want to jeopardize his relationship with Josh, he spoke with Josh's principal about the marks, but did not otherwise contact the authorities.

Later that evening, Mother called and asked to speak with Josh. Middleton informed her Josh was about to get in the shower, and that Josh would call her back once he was through. Moments later, Mother called back and demanded Josh be brought to her. Middleton did not understand what could have transpired in those few minutes to make Mother so angry, but speculated that Mother's change in demeanor could have occurred because she thought Middleton might see the marks she left on Josh when Josh undressed to shower. Middleton told Mother it was his night with Josh, and because Josh had been sick earlier, he should not travel outside in the winter right after a shower. Middleton testified he was afraid for Josh's welfare and refused to bring him to Mother's house. When the telephone conversation ended, he called the police department and reported the alleged abuse. Mother and McCants also contacted the police to report Middleton's refusal to return Josh.

When the police arrived, they brought Mother and McCants with them. Because Mother had legal custody, Josh was returned to her. Officer Maggie Carver reported the case to the Department of Social Services, but inexplicably, the Department informed Officer Carver in a voicemail that it would not "take the case." Officer Carver testified she believed Middleton's reason for reporting the alleged abuse was out of true concern for Josh.

After this incident in January 2003, Mother terminated all contact between Josh and Middleton. She also contacted school officials and told them Middleton was not allowed to see Josh. Approximately one year later, Mother, McCants, and Josh moved to Florence, South Carolina.

On February 11, 2003, Middleton filed this action seeking

custody of Josh.[1] He also filed a motion to have a guardian ad litem appointed to represent Josh. Mother answered, stating the action should be dismissed because Middleton, not being biologically related to Josh, lacked standing to proceed. The family court (1) denied Mother's motion to dismiss; (2) appointed a guardian to represent Josh; (3) required Middleton to join Eugene Hollington, Josh's biological father; and (4) denied Middleton any visitation. On April 14, 2003, Middleton filed an amended complaint joining Hollington to the action. Despite being joined in the action and having the pleadings served on him by certified mail, return receipt requested, Hollington has never made an appearance or responded.

On June 23, 2003, the guardian filed a motion seeking counseling for Josh. The family court issued an order requiring Mother, Middleton, and Josh to cooperate in counseling. Several months later the guardian filed an ex parte emergency motion seeking to compel Mother's continued compliance with court mandated counseling because Mother stopped taking Josh to counseling. After a hearing, the family court ordered both Mother and Josh to continue meeting with the therapist, Dr. Kay Newman.

On November 10, 2004, Dr. Newman issued her report recommending Middleton resume visitation with Josh. In her report she stated Josh was a kind, gentle boy whose primary concern was that Dr. Newman understand how much he loves Middleton. According to Dr. Newman, Josh and Middleton separately, "report[ed] a very close, happy relationship between them. Josh reminisce[d] much about Mr. Middleton's taking him to church, Boy Scouts, signing him up for and attending his basketball league, and other events." Dr. Newman noted that Josh's biological dad had never been involved in Josh's life,[2] while Middleton had been, with Mother's blessing, very involved. She also stated McCants declined to be involved in any of the therapy sessions. Further, her report revealed that because Middleton had been instrumental in involving Josh in activities and was an important source of

---

1. At trial, Middleton amended the complaint, seeking only visitation with Josh.

2. Other than seeing Josh one time when Josh was three days old, Hollington has never visited Josh.

socialization, the move to Florence coupled with losing contact with Middleton, had a negative impact on Josh emotionally. Ultimately, Dr. Newman recommended Josh resume visitation with Middleton, with Mother's liberal input into the form of visitation.

After a three-day trial, the family court denied Middleton's right to visitation. The family court found that despite Mother's position that Middleton had been overindulgent with Josh, Middleton had done nothing "which would have a negative effect on the relationship between the child and his Mother." However, the family court found that under the law of South Carolina, a fit, biological parent has the fundamental right to make decisions concerning whether a third party may visit her child. The family court reasoned that because Josh knew he had a biological father, Middleton could not be his psychological parent, and therefore Middleton had no legal right to petition for visitation. This appeal followed.

## STANDARD OF REVIEW

On appeal from the family court, this court has the authority to find facts in accordance with its own view of the preponderance of the evidence. *Rutherford v. Rutherford,* 307 S.C. 199, 204, 414 S.E.2d 157, 160 (1992). This broad scope of review does not require us to disregard the family court's findings. *Cherry v. Thomasson,* 276 S.C. 524, 525, 280 S.E.2d 541, 541 (1981). We remain mindful of the fact the family court judge, who saw and heard the parties, is in a better position to evaluate their credibility and assign weight to their testimony. *Id.*

## LAW/ANALYSIS

In this case, we are asked to determine what legal standard applies to a third party's claim for visitation of a non-biological child for whom he claims to have functioned as a psychological parent. On appeal Middleton argues he has standing to seek visitation because he functioned as a psychological parent to Josh. For the reasons set forth below, we agree, and find the family court erred in concluding Middleton was not Josh's psychological parent and erred in finding Middleton was not entitled to visitation. Accordingly, we reverse and remand.

## I. Standing

■ In all child custody cases, the welfare of the child and the child's best interest is the "primary, paramount. and controlling consideration of the court. . . ." *Cook v. Cobb*, 271 S.C. 136, 140, 245 S.E.2d 612, 614 (1978) (citing *Davenport v. Davenport*, 265 S.C. 524, 220 S.E.2d 228 (1975)). To further promote the goal of safeguarding the best interests of children, the General Assembly has recognized that in certain circumstances, persons who are not a child's parent or legal guardian may be proper parties to a custody proceeding. Section 20–7–420(20) of the South Carolina Code grants the family court jurisdiction to award custody of a child to the child's parent or "any other proper person or institution." Pursuant to that statute, third parties have been allowed to bring an action for custody of a child. *See Kramer v. Kramer*, 323 S.C. 212, 473 S.E.2d 846 (Ct.App.1996) (awarding custody to child's aunt and uncle over biological mother); *Donahue v. Lawrence*, 280 S.C. 382, 312 S.E.2d 594 (Ct.App.1984) (finding stepmother had standing to initiate termination of parental rights action).

■ Under the penumbra of custody is the lesser included right to visitation. Because Middleton would have standing to bring an action for custody, it follows that he would also have standing to seek visitation. In *Dodge v. Dodge*, 332 S.C. 401, 415 505 S.E.2d 344, 351 (Ct.App.1998), this court found "no authority" to grant visitation rights to a stepfather of nineteen months, once the biological father, who had been in prison, resumed full custody. However, we specifically found no psychological parent relationship existed between stepfather and children, as the children often saw their biological father. *Id.* at 413, 505 S.E.2d at 350.

In this case, Middleton claims he has a right to visitation based on his status as a psychological parent and the significant harm denying visitation causes Josh. As explained more fully below, we agree, and hold the family court erred in finding Middleton lacked standing to bring this action.

## II. Third Party's Right To Visitation

### A. Psychological Parent Doctrine

In refusing to grant Middleton visitation, the family court specifically found that because Josh knew he had a biological

father, Middleton was not Josh's psychological father. We disagree.

The notion of a psychological parent or de facto parent was first recognized by the South Carolina Supreme Court in *Moore v. Moore,* 300 S.C. 75, 386 S.E.2d 456 (1989). In Moore, the supreme court found that although a psychological parent-child relationship existed between the child and his unrelated custodians, such a bond was inadequate to support awarding permanent custody to the custodians where the biological parent was fit. *Id.* at 80–81, 386 S.E.2d at 459. Notably, the supreme court found the psychological parent-child relationship was built largely upon the custodians' overt acts, which inhibited the relationship between the biological father and the child.

Subsequently, in *Dodge v. Dodge,* 332 S.C. 401, 413, 505 S.E.2d 344, 350 (Ct.App.1998), this court found that although the children had a close and loving relationship with their stepfather and grandparents, the level of attachment did not rise to the level of a psychological parent-child relationship. Therefore, we found the family court erred in granting joint custody to the stepfather and grandparents, and should have awarded the biological father full custody. *Id.* at 415, 505 S.E.2d at 351.

Both *Moore* and *Dodge* recognized the existence of the psychological-parent doctrine; however, neither case explores how a party establishes that he or she is the psychological parent to a child of a fit, legal parent.

The question of who may be deemed a psychological parent for purposes of receiving parental responsibilities has been answered variously. Some states define a psychological parent by breaking down parenthood to its fundamental elements. In California, for example, a de facto parent is defined as "a person who has been found by the court to have assumed, on a day-to-day basis, the role of parent, fulfilling both the child's physical and psychological needs for care and affection, and who has assumed that role for a substantial period." Cal. Rules of Court, R. 1401(8); *see also C.E.W. v. D.E.W.,* 845 A.2d 1146, 1152 (Me.2004) (declining to define a de facto parent, but noting "it must surely be limited to those adults who have fully and completely undertaken a permanent, un-

equivocal, committed, and responsible parental role in the child's life").

Other states have attempted to refine the concept further by expanding the definition of psychological parenthood. The Alaska Supreme Court has defined a psychological parent as:

[O]ne who, on a day-to-day basis, through interaction, companionship, interplay, and mutuality, fulfills the child's psychological needs for an adult. This adult becomes an essential focus of the child's life, for he is not only the source of the fulfillment of the child's physical needs, but also the source of his emotional and psychological needs.... The wanted child is one who is loved, valued, appreciated, and viewed as an essential person by the adult who cares for him.... This relationship may exist between a child and any adult; it depends not upon the category into which the adult falls—biological, adoptive, foster, or common-law—but upon the quality and mutuality of the interaction.

*Evans v. McTaggart*, 88 P.3d 1078, 1082 (Alaska 2004). Similarly, in *In re Clifford K.*, 217 W.Va. 625, 619 S.E.2d 138 (2005), the West Virginia Supreme Court defined the nature of the relationship that supports a finding that the third party acted as a psychological parent. The court stated:

A "psychological parent," who has greater protection under the law in a child custody proceeding than would ordinarily be afforded to one who is not the biological or adoptive parent of the child, is a person who, on a continuing day-to-day basis, through interaction, companionship, interplay, and mutuality, fulfills a child's psychological and physical needs for a parent and provides for the child's emotional and financial support.

*Id.* at 157.

The Wisconsin Supreme Court has developed a four-prong test for determining whether a person has become a psychological parent. In order to demonstrate the existence of a psychological parent-child relationship, the petitioner must show:

(1) that the biological or adoptive parent[s] consented to, and fostered, the petitioner's formation and establishment of a parent-like relationship with the child; (2) that the petitioner and the child lived together in the same household;

(3) that the petitioner assumed obligations of parenthood by taking significant responsibility for the child's care, education and development, including contributing towards the child's support, without expectation of financial compensation; [and] (4) that the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship parental in nature.

*In re Custody of H.S.H.-K.*, 193 Wis.2d 649, 533 N.W.2d 419, 435–36 (1995). We believe this test provides a good framework for determining whether a psychological parent-child relationship exists. These four factors ensure that a nonparent's eligibility for psychological parent status will be strictly limited.

The first factor is "critical because it makes the biological or adoptive parent a participant in the creation of the psychological parent's relationship with the child." *V.C. v. M.J.B.*, 163 N.J. 200, 748 A.2d 539, 552 (2000) (explaining the Wisconsin test's first prong). This factor recognizes that when a legal parent invites a third party into a child's life, and that invitation alters a child's life by essentially providing him with another parent, the legal parent's rights to unilaterally sever that relationship are necessarily reduced. The legal parent's active fostering of the psychological parent-child relationship is significant because the legal parent has control over whether or not to invite anyone into the private sphere between parent and child. Where a legal parent encourages a parent-like relationship between a child and a third party, "the right of the legal parent [does] not extend to erasing a relationship between [the third party] and her child which [the legal parent] voluntarily created and actively fostered." Id. at 552 (citing *J.A.L. v. E.P.H.*, 453 Pa.Super. 78, 682 A.2d 1314, 1322 (1996)). A parent has the absolute control and ability to maintain a zone of privacy around his or her child. However, a parent cannot maintain an absolute zone of privacy if he or she voluntarily invites a third party to function as a parent to the child. *See In re E.L.M.C.*, 100 P.3d 546, 560 (Colo.Ct.App. 2004); *see also Rubano v. DiCenzo*, 759 A.2d 959, 976 (R.I. 2000) (explaining that when a legal parent allows a third-party to assume a role equal to one of the child's two parents, she renders her own parental rights with respect to the minor

child "less exclusive and less exclusory" than they otherwise would have been).

As for the second prong, which considers whether the psychological parent and child have lived together, it further protects the legal parent by restricting the class of third-parties seeking parental rights. Normally, the child, legal parent, and psychological parent have at one point, all resided together under the same roof. However, we can conceive of a situation, as in this case, where the legal parent and the psychological parent operated under a sort of joint custody agreement where the child spends half the time at the legal parent's house. The other half of the time is spent at the psychological parent's house, which the child also considers home. This type of arrangement also suffices to meet the second part of the test.

The last two prongs are the most important because they ensure both that the psychological parent assumed the responsibilities of parenthood and that there exists a parent-child bond between the psychological parent and child. The psychological parent must undertake the obligations of parenthood by being affirmatively involved in the child's life. The psychological parent must assume caretaking duties and provide emotional support for the child. These duties, however, must be done for reasons other than financial gain, which guarantees that a paid babysitter or nanny cannot qualify for psychological parent status. *See In re E.L.M.C.*, 100 P.3d at 560 (citing *Rubano*, 759 A.2d at 976) ("The additional elements further protect the legal parent against claims by neighbors, caretakers, babysitters, nannies, au pairs, nonparental relatives, and family friends."). We further note that when both biological parents are involved in the child's life, a third party's relationship with the child could never rise to the level of a psychological parent, as there is no parental void in the child's life.

Additionally, the length of time the psychological parent acted in a parental capacity must be sufficient for a parent-child bond to have been established. The existence of a parent-child bond "is simply not a court-bestowed determination . . . [t]he finding of the existence of such a bond reflects that the singular emotional and spiritual connection, ordinarily

only expected in the relationship of a legal parent and child, has been created between an adult and child" who have neither blood nor adoption between them. Id. at 557 (Long, J., concurring). Further, "inherent in the bond between child and psychological parent is the risk of emotional harm to the child should the relationship be curtailed or terminated." *In re E.L.M.C.*, 100 P.3d at 560. South Carolina has long recognized the importance of the degree of attachment, echoed by other jurisdictions, between a child and a third-party in making a custody determination between a biological parent and the third party. *See Moore*, 300 S.C. at 80–81, 386 S.E.2d at 459 (considering whether a psychological parent-child relationship exists in order to determine the degree of attachment); *see also In re Clifford K.*, 619 S.E.2d at 157 ("The resulting relationship between the psychological parent and the child must be of substantial, not temporary, duration and must have begun with the consent and encouragement of the child's legal parent or guardian.").

Turning to the facts here, the record is replete with evidence showing that Mother invited Middleton to act as a father. Mother sent Middleton pictures of Josh as a baby and insinuated that he was Josh's father. When Josh was three years old, Mother and Middleton worked out a schedule whereby Middleton had Josh from Thursday through Sunday every week. Middleton paid at least half of the daycare costs, and was listed as the emergency contact on the daycare registration.

As Josh entered elementary school, it was Middleton rather than Mother who accompanied him to his first day of kindergarten, and it was Middleton who brought Josh to school almost every morning. Middleton also picked up Josh from school nearly every day and accompanied Josh on school field trips. Middleton took Josh to doctor and dentist appointments, and Josh attended family reunions and functions with Middleton.

For the first ten years of his life, Josh spent a considerable amount of time with Middleton. Mother cultivated this relationship by giving Middleton parental responsibilities and by allowing Josh to spend a significant amount of his childhood with Middleton. In essence, Josh lived with Middleton at

least half of the week for most of his life. Mother, by ceding over a large part of her parental responsibilities to Middleton, fostered the parent-child bond between Middleton and Josh.

The second prong in the psychological parent test, that the child and psychological parent reside together, is also met. The evidence shows Josh spent at least half of any given week residing with Middleton. Additionally, Josh had his own room, clothes, and school books in Middleton's house.

We also find Middleton assumed the obligations of parenthood by taking significant responsibility for Josh's care, education, and development. Middleton paid for Josh's preschool. Additionally, he paid mother $250 dollars per month while Josh was in Mother's custody. Although Middleton had not thought to keep receipts, he was able to document approximately $12,000 he had given Mother over the years. Further, Middleton established a savings account for Josh's education.

Middleton not only contributed financially to Josh's development, he also spent quality time with Josh. On weekends they would go to movies and visit Frankie's Fun Park. On Sundays, Middleton and Josh attended church. Hollington, on the other hand, made no attempt to fulfill Josh's emotional need for a father. In fact, other than seeing Josh one time when he was three days old, Hollington has never visited Josh. This parental void left by Josh's biological father coupled with the parental obligations assumed by Middleton compel us to find that Middleton undertook the responsibilities necessary to meet the third prong of the psychological-parent test.

As to the fourth prong, the record reveals Josh spent ten years of his life thinking of Middleton as a father and is suffering greatly in his absence. Dr. Newman, the court-appointed therapist, opined that Middleton is a psychological parent to Josh. She stated that even though Josh has not seen Middleton in two years, he wanted her to tell the court that he misses Middleton and wants to see Middleton. In her clinical opinion, the emotional attachment between Josh and Middleton is so strong that despite the passing of two years' time, Josh still feels a sense of loss. According to Dr. Newman, the severance of the relationship between Middleton and Josh will

have a profound, negative impact for the rest of his life.[3]

## B.   Compelling Circumstances

In declining to grant Middleton visitation, the family court stated: "When our law does not allow us to grant autonomous visitation to grandparents against the wishes of a fit parent, I don't know how we can grant autonomous visitation to an unrelated third party against the wishes of a fit parent." While great deference is accorded to the visitation decisions made by a fit parent, the family court can in fact grant visitation to a third-party over a fit parent's objection when faced with compelling circumstances.

In *Troxel v. Granville,* the Supreme Court of the United States considered whether the application of the state of Washington's visitation statute violated Granville's due process right to make decisions concerning the custody, care, and control of her children.   530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000).   The dispute in *Troxel* arose because Granville sought to limit her in-laws' visitation to one visit per month and holidays.   *Id.* at 71, 120 S.Ct. 2054.   In turn, the grandparents sought visitation under a Washington statute that provided "any person" could petition for visitation rights at "any time."   Id. at 61, 120 S.Ct. 2054.   The grandparents did not rely on a common law de facto or psychological parent doctrine.

A plurality of the Court explained that parents have a protected liberty interest in the care, custody, and control of their children. Id. at 65–66, 120 S.Ct. 2054.   The plurality noted this fundamental right of parents encompasses the presumption that a fit parent will act in the best interest of his or her child.

The Supreme Court held Washington's visitation statute unconstitutionally infringed upon Granville's fundamental right to direct the upbringing of her children.   The statute's language effectively allowed "any third party seeking visitation to subject any decision by a parent concerning visitation of the parent's children to state-court review," and if the trial

---

**3.**   Additionally, Dr. Newman says that Josh knows he has a biological father, but does not sense a loss in not knowing him.   Josh's sense of loss is directly related to the loss of Middleton in his life.

judge disagreed with the parent's determination of the child's best interest, the judge's view would prevail. *Id.* at 67, 120 S.Ct. 2054. The plurality noted the trial court's order "was not founded on any special factors that might justify the State's interference with Granville's fundamental right to make decisions" regarding her children. *Id.* at 68, 120 S.Ct. 2054.

The plurality gave three reasons to support its conclusion that no "special factors" justified the State's interference in this case. First, the grandparents did not allege that Granville was an unfit parent, and therefore Granville was presumed to have acted in the best interest of her children. *Id.* at 68, 120 S.Ct. 2054. Second, the trial court did not give special weight to Granville's determination of what was in her children's best interest. *Id.* at 69, 120 S.Ct. 2054. Third, Granville had not sought to cut off visitation entirely. Notably, the plurality did not consider "whether the Due Process Clause requires all nonparental visitation statutes to include a showing of harm or potential harm to the child as a condition precedent to granting visitation." *Id.* at 73, 120 S.Ct. 2054. The Court explained, "[w]e do not, and need not, define today the precise scope of the parental due process right in the visitation context." *Id.* Thus, the *Troxel* decision, which turned on the constitutionality of the state of Washington's extremely liberal visitation statute, has little bearing on the peculiar facts of the case before us.

We find the decision by our own supreme court in *Camburn v. Smith*, 355 S.C. 574, 586 S.E.2d 565 (2003), more pertinent to our determination of whether Middleton can be awarded visitation with Josh. In *Camburn*, maternal grandparents successfully petitioned the family court for visitation of their daughter's three children over the objection of the children's mother and her husband.[4] Despite uncontested evidence that the children were well-cared for by their mother and her husband, the family court found visitation would be in the children's best interest because their grandparents were a stabilizing factor in their lives. Mother and her husband appealed, and our supreme court reversed. The *Camburn*

---

4. Mother's husband was the biological father of one of the children the grandparents sought to visit.

court held: "Before visitation may be awarded over a parent's objection, one of two evidentiary hurdles must be met: the parent must be shown to be unfit by clear and convincing evidence, or there must be evidence of compelling circumstances to overcome the presumption that the parental decision is in the child's best interest." *Id.* at 579–80, 586 S.E.2d at 568. As an example of a compelling circumstance, the *Camburn* court specifically mentioned a situation in which denying visitation would cause "significant harm to the child." Id. at 579, 586 S.E.2d at 568. Ultimately, the supreme court found that the circumstances in *Camburn* were not compelling enough to justify awarding grandparents visitation of the three children in the face of their mother and her husband's decision to the contrary.

■ Here, the record is replete with evidence illustrating how Mother's refusal to allow Middleton to visit with Josh has caused Josh significant harm. After the separation, Josh's fourth grade teacher asked the school's guidance counselor to talk with Josh because "he just wasn't himself [and] seemed really sad." The guidance counselor testified that she arranged for Josh to attend a support group for children who have suffered from losing someone they love. During these group sessions, Josh expressed grief over losing Middleton, who Josh talked about "as his father and his dad."

Mother's daughter, Tenille Johnson, testified about the special relationship Middleton had with Josh. Since Josh's visitation with Middleton ended, Johnson testified that Josh "is not the same happy person that he used to be" and that his attitude toward life has changed.

Dr. Newman, who counseled Josh for eighteen months prior to the final hearing, explained that the severance of Middleton's visitation with Josh "will have a profound impact . . . [that] reverberates throughout life." Dr. Newman further explained that Josh, who was ten years old when his relationship with Middleton abruptly ended, was particularly devastated by the loss because he was at a stage in life when he was learning how to socialize. In the report she submitted to the court, Dr. Newman opined that Josh's loss of contact with Middleton rendered Josh "at-risk regarding his ability to trust, [and to] form and maintain close relationships."

Similar to the testimony from Josh's teachers, counselor, and his sister, the court-appointed guardian ad litem reiterated: "[T]he one thing that I can tell the Judge that I strongly believe is that Joshua Hollington loves Kenneth Middleton. He misses Kenneth Middleton. I have no doubt of that whatsoever." The guardian testified that "the separation of a year, year and a half had done nothing to lessen [Josh's] feelings there.... [S]ince [the relationship with Middleton] ended he is—I'm not trained like Ms. Newman is. I don't know the correct terms as far as grieving, but he's missing Mr. Middleton quite a bit." Even Mother herself testified that she did not have "any doubt at all that Josh loves Kenneth Middleton ... [or] that Josh misses Kenneth Middleton."

## CONCLUSION

Based on the overwhelming evidence in the record, we reverse the family court's finding that Middleton was not Josh's psychological parent. Middleton's absence from Josh's life has caused and will continue to cause significant harm to Josh. Thus, the circumstances of this case are compelling enough to meet the "evidentiary hurdle" third-parties must overcome when seeking visitation over the objection of a fit parent. *Camburn*, at 579–80, 586 S.E.2d at 568.

We caution that our decision today does not automatically give a psychological parent the right to demand *custody* in a dispute between the legal parent and psychological parent. The limited right of the psychological parent cannot usually overcome the legal parent's right to control the upbringing of his or her child. *See In re Clifford K.*, 217 W.Va. 625, 619 S.E.2d 138, 157–58 (2005) (noting that in "exceptional cases and subject to the court's discretion, a psychological parent *may* intervene in a custody proceeding ... when such intervention is likely to serve the best interest of the child(ren) ....") (emphasis added); *see V.C.*, 748 A.2d at 554 (stating that custody is usually given to the legal parent, with "[v]isitation" as the "presumptive rule" for psychological parents).

Establishing psychological parenthood is a difficult undertaking. However, once established, the bond between the psychological parent and child should not be unilaterally sev-

ered by the biological parent who fostered the relationship in the first place. The standard to be applied is whether compelling circumstances exist to overcome the presumption that a fit, legal parent acts in the child's best interest, and of course, visitation must actually be in the child's best interest. The compelling circumstances standard encompasses a situation where, as here, a third party has attained psychological parent status.

Accordingly, we reverse the order of the family court and remand the action so that a suitable visitation schedule can be established as expeditiously as possible. Because we find Josh is suffering from Middleton's absence, we order that visitation between Middleton and Josh resume on a schedule of one weekend per month, beginning in the month of May 2006, until a final hearing can be scheduled.

**REVERSED AND REMANDED.**

KITTREDGE, J., concurs and ANDERSON, J., concurs in result only in a separate opinion.

ANDERSON, J. (concurring in result only in a separate opinion):

In *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), the Supreme Court of the United States held that parents have a protected liberty interest in the care, custody and control of their children that is a fundamental right protected by the Due Process Clause. This fundamental right encompasses the presumption that a fit parent will act in the best interest of his or her child. I have gargantuan trepidation in regard to expanding *Camburn v. Smith*, 355 S.C. 574, 586 S.E.2d 565 (2003), and *Moore v. Moore*, 300 S.C. 75, 386 S.E.2d 456 (1989), beyond the actual holdings in these cases.

I **VOTE** to **ALLOW** visitation in the case *sub judice* over the objection of the biological mother and would confine the holding to the unique factual circumstances in this particular case.