KONDUROS, J.:
**67 Brittany Martin (Mother) appeals an order awarding custody of her minor child (Child) to Karl (Grandfather) and Lisa Jobst (Grandmother, collectively Grandparents). On appeal, Mother argues the family court erred in (1) finding Grandparents had standing to seek custody, (2) dismissing the South Carolina Department of Social Services (DSS) from the action, and (3) holding Mother in contempt for failing to attend mediation. We affirm.
FACTS
Child was born in 2013. Mother and Brian Jobst (Father) are Child's parents, and Grandparents are Child's paternal grandparents. On June 5, 2015, Mother was arrested for driving under the influence (DUI), possession of marijuana, and child endangerment because Child was in the car with Mother at the time of her arrest. The following day Mother and Father signed a Safety Plan with DSS agreeing Father would act as Child's protector and not allow Mother to have unsupervised contact with Child during DSS's investigation. Because of Father's work schedule, Mother and Father asked Grandmother, who lived in Texas, to come to South Carolina and care for Child. Grandmother came to South Carolina, and on June 11, 2015, Grandparents filed this action alleging Mother and Father were unfit, Grandparents were Child's de facto custodians or psychological parents, and custody with Grandparents was in Child's best interest. On June 15, 2015, the family court issued an order granting Grandparents temporary custody of Child and requiring them to remain in South Carolina. On August 17, 2015, the family court issued a second order granting Grandparents temporary custody of **68 Child and allowing Child to move to Texas, where Grandparents lived.
On October 4, 2016, the family court held a final hearing. Grandmother testified Mother and Father previously lived with Grandparents in South Carolina while Mother was pregnant, and Mother, Father, and Child lived with Grandparents until Child was about one year old. She stated everyone got along well during that time and testified, "We took care of the baby. [Father] took *518 care of the baby. [Mother] at times took care of the baby." However, she believed Mother was not always attentive to Child. She explained, "[Mother] would get up at two o'clock [p.m.] and take a shower, smoke a couple of cigarettes[,] and get dressed and go off to work, and we wouldn't see her until two, three, four in the morning, whenever she came home ...." Grandmother added "Sometimes she would do the two o'clock feeding before she went to work and sometimes she wouldn't. She didn't say much. She just went on her way."
Grandmother stated Father worked full-time and attended school, and he "was a little disappointed that [Mother] wasn't ... doing more with [Child]." She stated she and Grandfather were able to help care for Child in part because Grandmother worked two days per week and Grandfather had been laid off from his job. Grandmother testified she and Grandfather moved to Texas in July 2014.
When Grandmother arrived in South Carolina following Mother's arrest, the DSS caseworker told her "if Father and Mother did not pass their drug test, that either [Grandmother] could get custody of [Child] or she would go to a foster home, ... and that if [Grandmother] wanted [custody], [she] needed to get an attorney."
Grandmother testified Father visited Child "every night after work" when she lived in South Carolina with Child under the temporary custody order. She testified, "[Child] was happy to see him, glad to see him." Grandmother testified Mother had scheduled visitation on Wednesdays, Saturdays, and Sundays and "[s]ometimes she would come for the visitation. Sometimes she wouldn't." Grandmother described Mother's behavior during that time as "weird." She stated Mother had "[j]erking movements, tremors. She had facial expressions.
**69 Sometimes ... her pupils were really dilated." Grandmother stated she asked Mother whether she had entered drug treatment or done anything required by the court; Mother replied, "[W]hat are you talking about? No one told me I had to do anything."
Grandmother testified the modified temporary order allowing Grandparents to take Child to Texas required Grandparents to pay Mother's travel expenses for monthly visits. The order also required Mother to pay child support, which she generally failed to do with the exception of August of 2015 and January 2016.
Regarding Mother's visits to Texas, Grandmother testified Mother generally acted bizarre-exhibiting tremors, making odd facial expressions, staying up late, and going outside frequently. Grandmother further testified Mother had limited engagement with Child, argued with Child on several occasions over trivial matters, like tea sets, water guns, and coloring. Grandmother estimated Mother spent about twenty to forty minutes with Child during visits and the visits were largely unproductive. She stated Mother "call[ed Child] here and there, not on a regular basis," but Child "usually didn't want to talk to her."
Grandmother testified Child attended preschool, did not have special needs or concerns, and was thriving in Grandparents' custody. She stated Father had moved to Texas to live with them and helped pay household expenses. She further stated Texas Child Protective Services (CPS) visited their home monthly at DSS's request, she was not aware of any negative reports, and CPS's last visit was in June 2016. Grandmother testified she and Grandfather had driven to South Carolina for court-ordered mediation with Mother, but Mother did not attend. Grandmother stated she spent $400 for the mediator, $300 per hour for her attorney, and around $1,000 in travel expenses. She requested Mother be held in contempt for not appearing at mediation or paying child support.
On cross-examination, Grandmother acknowledged the visits between Child and Mother had "gotten a little bit better" but maintained the visits were still "not good." Grandmother stated Child did not appear upset when Mother left, and **70 Mother's ability to interact with Child had not improved. Grandmother also acknowledged DSS planned to file a removal action against Mother and Father in 2014 after Father failed a drug test, but testified DSS allowed Father to have unsupervised contact with *519 Child after he passed a drug test in May 2016. She stated DSS "was still directing this case" at that time.
Grandfather testified he was married to Grandmother and earned $120,000 per year in Texas. He described Child as "a great joy," believed Child was doing "wonderful[ly]," and believed it would be in Child's best interest to remain in Grandparents' custody. Grandfather stated he and Grandmother tried to encourage a relationship between Mother and Child during visits. He stated he never saw any indication Mother had stopped using drugs; however, he "was quite convinced [Father] stopped using them." Grandfather noted Father's job required a drug test.
Dana Lyles, a human services specialist for DSS, testified she became involved with this family when DSS received a report on June 5, 2015, that Child may have been abused or neglected. She testified Mother and Child were living with Angela Ivey, Mother's mother. Lyles visited them at Ivey's house on June 6. Lyles stated DSS determined Child "would need a kinship caregiver," but Ivey could not "serve in that position because she was listed in the central registry, and her husband Ronald ... was the perpetrator on a past indicated child abuse and neglect case." Lyles indicated DSS agreed to a safety plan "allowing [Father] to be the protector of [Child] and [providing] he would supervise all contact between Child [and Mother]." She testified DSS requested Father submit to a drug screen; while they were awaiting the results of that test, DSS learned "[Grandmother] was flying in and that she wanted to be the protector of [Child] because [Father] was working." Lyles clarified she "didn't place [C]hild with [Grandparents]. [She] placed [C]hild with [Father]." On cross-examination, Lyles explained the safety plan did not address custody; it "only addresse[d] placement of [C]hild and how [C]hild would be protected in the presence of the alleged perpetrator."
**71 Lyles explained she was "subpoenaed to come to court for [Grandmother's] private action" before the results of Father's drug screen came back. She testified Grandmother obtained temporary custody, and DSS transferred the case to the family preservation department. Lyles acknowledged DSS "didn't object to [Grandmother] getting custody." She explained the family court entered the temporary custody order before DSS completed its investigation, but DSS continued its investigation. Lyles stated DSS indicated a case for physical neglect against Mother but did not address custody because of the private action.
Lyles's involvement with the case ended in July 2015, when the case was transferred to Stefanie Hill, a DSS family preservation worker. Hill's role was "to work with the family on correcting the reasons for DSS involvement." Hill testified she was assigned the case in August 2015, and she met with Mother to discuss a treatment plan. She stated DSS asked Mother to complete a drug and alcohol assessment and also parenting classes. Hill testified she discussed the treatment plan with Mother, Mother was aware of the services she had to complete, and Mother signed the treatment plan on August 4, 2015. Hill provided she maintained regular contact with Mother "in an effort to get her to complete" treatment, and Mother "started doing it, but she did not fully complete it."
Hill testified DSS referred Mother to a twelve-week parenting program; Mother began the classes on August 17, 2015; "[h]er last session there was January 25, 2016"; and she only completed eight of the twelve sessions. Hill stated DSS also referred Mother to a drug program but Mother was inconsistent with the program. Hill stated Mother began treatment on November 30, 2015, but "by January 20th, 2016[,] she was told that she could no longer attend the agency" because she "broke confidentiality" by discussing another client in the program. Hill indicated she told Mother the agency could refer her to another agency, and Mother knew "she had to speak to that agency so they [could] make referrals, but she never went back in."
Hill testified she continued contacting Mother "off and on" "until about June" 2016. She testified, "Most of the time I couldn't get in contact with [her]." She explained, "[W]hen I **72 would call [Mother], it would be there is something going on with her phone, *520 voicemail not set up, or no answer. ... [S]ince I didn't get her by phone, I would go to the home and sometimes nobody would be there or answer the door."
Hill stated she spoke to Mother the day before the May 2016 mediation, and Mother told her she had transportation and planned to attend. However, Mother did not attend. Hill testified she went to Mother's home on June 11, 2016, and a male answered the door indicating Mother was home and said he would get her. However, Ivey came to the door and said Mother was not feeling well. Hill testified Ivey said "she would [bring Mother] to the [DSS] office by two o'clock," but Mother did not appear. Hill testified she never saw Mother after that, and she closed the DSS file in July 2016. Hill indicated Mother did not cooperate with her a majority of the time. She testified she did not observe any behavioral changes in Mother that indicated Mother was stable or complying with treatment. Hill stated DSS never filed a removal action because Grandmother filed a private custody action. She acknowledged the last time she spoke to Mother was May 2016. Hill testified she explained to Mother the steps she could take to attempt to regain custody in the private action if DSS closed its case. Hill believed DSS should be dismissed as a party to the private action.
Following Hill's testimony, DSS moved to be dismissed from the action, asserting it did not "have a position on the custody." Mother objected, asserting "DSS is the reason this child got removed." Mother then requested the "hearing be considered a merits hearing and that DSS be ordered to put the court-ordered treatment plan in place and for [the family] court to adopt the treatment plan." The family court deferred ruling on DSS's motion.
After Grandparents rested, Mother moved for a nonsuit, arguing Grandparents were not de facto custodians or psychological parents, and thus, did not have standing to file the custody action. The family court denied Mother's motion.
Father testified in his case and asked the court to grant Grandparents custody of Child because Child was thriving in their care. Father testified he lived with Grandparents, saw Child daily, and did not have immediate plans to move out of **73 their home. Father acknowledged he and Mother lived with Grandparents before they moved to Texas, and stated he and Mother fostered a parent-like relationship between Child and Grandparents. Father stated he earned between $55,000 and $60,000 per year and contributed to Child's care. He acknowledged testing positive for marijuana when this action began but stated he had completed a twelve-week drug and alcohol program, and he tested negative for drugs prior to starting his job. Father did not believe Mother could adequately care for Child.
The guardian ad litem (GAL), Ken Shabel, stated he met with Mother in August 2015, and "it was pretty clear ... she knew what she needed to do. She had actually already had her [drug] assessment and was waiting on the group enrollment program to begin." However, he stated he never saw any drug screens after January 2016 or certificates of completion for the treatment programs. The GAL testified he reviewed the public index and learned Mother was arrested on July 13, 2016, for possession of marijuana, "public drunkenness, or being intoxicated on a state highway or city road, and possession of drug paraphernalia"; Mother was convicted in her absence on July 29. The GAL stated Mother had either served her time or paid the fine for that charge. He believed Father "rectified [his] drug issues." He also believed Child was "well taken care of" with Grandparents.
Following the close of evidence, Mother renewed her directed verdict/involuntary non-suit motion, asserting Grandparents were not psychological parents or de facto custodians. The family court denied the motion.
In its final order, the family court found clear and convincing evidence showed Mother was unfit. The court found Mother tested positive for amphetamines, opiates, and marijuana; she was arrested for possession of marijuana in March 2015 and pleaded guilty in April 2015; she was arrested again for possession of marijuana in June 2015 and pleaded guilty in February 2016; and she was arrested a third time for possession of marijuana *521 in July 2016 and convicted in her absence. The family court found DSS determined Mother physically neglected Child, DSS referred Mother for drug treatment, Mother did not complete the treatment, and Mother did not **74 cooperate with DSS. The family court determined Father was not unfit but was not contesting custody.
Regarding standing, the family court found Grandparents were not Child's de facto custodians because they did not have custody of Child for six months before they filed the custody action. However, the family court found, "[S]tanding under this statute was not needed since [Grandparents] received physical custody from the parents either through their consent or acquiescence at the time when neither parent could retain custody ...." The family court found Child was "bonded with [Grandparents] as if they [were] her parents and she was entirely dependent upon them for all her needs," and she lived with Grandparents during the first year of her life. The family court determined, "[Grandparents] may, in fact, be psychological parents, but because the parents are either unfit or unwilling to have custody and [Grandparents] have a loving, bonded parental-type relationship with [C]hild, it is in her best interest to remain in the permanent custody of [Grandparents.]."
The family court granted DSS's motion to be dismissed as a party, suspended Mother's visitation until she tested negative for drugs, and ordered Mother to pay child support. The family court also ordered Mother to reimburse Grandparents $400 in mediation fees and $600 in attorney fees for the missed mediation. This appeal followed.
STANDARD OF REVIEW
On appeal from the family court, this court reviews factual and legal issues de novo. Simmons v. Simmons , 392 S.C. 412, 414, 709 S.E.2d 666, 667 (2011) ; see also Lewis v. Lewis , 392 S.C. 381, 386, 709 S.E.2d 650, 652 (2011). Although this court reviews the family court's findings de novo, we are not required to ignore the fact that the family court, which saw and heard the witnesses, was in a better position to evaluate their credibility and assign comparative weight to their testimony. Lewis , 392 S.C. at 385, 709 S.E.2d at 651-52. The burden is upon the appellant to convince this court that the family court erred in its findings. Id . at 385, 709 S.E.2d at 652.
**75 LAW/ANALYSIS
I. STANDING
Mother argues Grandparents did not have standing to pursue custody of Child. We disagree.
"As a general rule, to have standing, a litigant must have a personal stake in the subject matter of the litigation." Ex parte Morris , 367 S.C. 56, 62, 624 S.E.2d 649, 652 (2006). "One must be a real party in interest, i.e. , a party who has a real, material, or substantial interest in the subject matter of the action, as opposed to one who has only a nominal or technical interest in the action." Id ."Statutory standing exists, as the name implies, when a statute confers a right to sue on a party, and determining whether a statute confers standing is an exercise in statutory interpretation." Youngblood v. S.C. Dep't of Soc. Servs. , 402 S.C. 311, 317, 741 S.E.2d 515, 518 (2013).
Section 63-3-550 of the South Carolina Code (2010) provides, "[A]ny person having knowledge or information of a nature which convinces such person that a child is neglected ... may institute a proceeding respecting such child." While no cases have interpreted this provisions in this particular context, both the plain language of the statute and existing case law support a finding Grandparents had standing to institute a custody action in this case.
In Middleton v. Johnson , 369 S.C. 585, 633 S.E.2d 162 (Ct. App. 2006), Middleton brought an action seeking visitation with his ex-girlfriend's biological son based on the fact he had played a prominent role in the child's life. Id . at 588, 633 S.E.2d at 164. The court of appeals determined Middleton was the child's psychological parent and allowing him visitation was in the child's best interest. Id . at 604, 633 S.E.2d at 172. In considering whether Middleton had standing to pursue his case, the court observed:
*522 To further promote the goal of safeguarding the best interests of children, the General Assembly has recognized that in certain circumstances, persons who are not a child's parent or legal guardian may be proper parties to a custody **76 proceeding. Section 20-7-420(20)[1 ] of the South Carolina Code grants the family court jurisdiction to award custody of a child to the child's parent or "any other proper person or institution." Pursuant to that statute, third parties have been allowed to bring an action for custody of a child.
Id . at 594, 633 S.E.2d at 167 (emphasis added).
Furthermore, the plain language of section 63-3-550 gives a broad grant of standing specifically in cases involving abuse or neglect. Recently, in South Carolina Department of Social Services v. Boulware , 422 S.C. 1, 809 S.E.2d 223 (2018), our supreme court considered whether foster parents had standing to petition for adoption of a child prior to DSS making an adoption placement. The court noted its case turned upon the interpretation of section 63-9-60 of the South Carolina Code (2010 and Supp. 2017), which provides "[a]ny South Carolina resident may petition the court to adopt a child" provided such petition is filed prior to the child being "placed" for adoption by DSS. Id . at 7, 809 S.E.2d at 226 (quoting S.C. Code Ann. § 63-9-60 ). The court concluded the analysis to determine standing was simple and required only looking at the statute's plain language even though such reading could lead to anomalous situations. Id . at 13-14, 809 S.E.2d at 229 ; see id . at 14, 809 S.E.2d at 230 (Hearn, J., concurring) (concluding in the majority the analysis is simple but acknowledging in the concurrence that the plain language could produce an anomaly unintended by the General Assembly).
Here, the plain language of section 63-3-550, indicates any person may bring a proceeding when he or she believes a child has been abused or neglected. The general principles of standing-that a party have an interest and personal stake in the matter-overlay that broad interpretation, but otherwise the statute simply provides "any person."
**77 Grandparents filed the action after DSS became involved due to allegations of drug use by Mother and Father and Mother's arrest. Grandparents alleged Mother and Father were unfit and unable to comply with a DSS safety plan. Based on these allegations, Grandparents had standing under section 63-3-550, and the family court properly considered the merits of this action. Further, because Grandparents had standing under section 63-3-550, they were not required to establish they were de facto custodians or psychological parents.[2]
II. DISMISSAL OF DSS
Mother argues the family court erred in dismissing DSS as a party to the case. We disagree.
First, DSS remained a party to the action until the conclusion of the case. Therefore the dismissal of DSS could not have prejudiced Mother in any meaningful way. Mother's real argument centers on the fact DSS did not proceed with its own removal action, and therefore she did not receive certain benefits pursuant to the removal statutes-primarily a court-appointed attorney and court-ordered treatment plan. Again, we disagree.
*523 DSS "may promulgate regulations and formulate policies and methods of administration to carry out effectively child protective services, activities, and responsibilities." S.C. Ann. § 63-7-910(E) (2010). DSS must investigate allegations of child abuse or neglect. S.C. Code Ann. § 63-7-920(A) (2010). DSS "is charged with providing, directing, or coordinating the appropriate and timely delivery of services to children found to be abused or neglected and those responsible for their welfare ...." S.C. Code Ann. § 63-7-960 (2010). "Services must not be construed to include emergency protective custody ...." Id .
**78 Whenever a child is placed in emergency protective custody, DSS must conduct a preliminary investigation. S.C. Code Ann. § 63-7-640 (2010). "During this time [DSS] ... shall convene[ ] a meeting with the child's parents or guardian ... to discuss the family's problems that led to intervention and possible corrective actions, including placement of the child." Id . If DSS assumes legal custody of a child following an investigation, it "shall begin a child protective investigation" and "initiate a removal proceeding in the appropriate family court." S.C. Code Ann. § 63-7-700(B)(1) (2010). DSS "may petition the family court for authority to intervene and provide protective services without removal of custody if [DSS] determines by a preponderance of evidence that the child is an abused or neglected child and that the child cannot be protected from harm without intervention." S.C. Code Ann. § 63-7-1650(A) (2010).
In this case, Mother agreed to the DSS safety plan naming Father as Child's protector. DSS investigated the case as it was required to do and indicated a case against Mother for abuse and neglect. DSS prepared a treatment plan and referred Mother for services as it was required to do. However, DSS never assumed legal custody of Child, and therefore, the removal statutes were not triggered. See § 63-7-700(B)(1) (providing DSS shall file a removal action if it assumes legal custody after a child is placed in emergency protective custody and DSS conducts its preliminary investigation). Consequently, we affirm the ruling of the family court dismissing DSS as a party to the case.
III. CONTEMPT
Mother argues the family court erred in holding her in contempt of court for failing to attend mediation because DSS cases are exempt from mediation. We disagree.
"A determination of contempt is a serious matter and should be imposed sparingly; whether it is or is not imposed is within the discretion of the trial judge, which will not be disturbed on appeal unless it is without evidentiary support." Haselwood v. Sullivan , 283 S.C. 29, 32-33, 320 S.E.2d 499, 501 (Ct. App. 1984). "An adult who wilfully violates, neglects, or refuses to obey or perform a lawful order of **79 the court ... may be proceeded against for contempt of court." S.C. Code Ann. § 63-3-620 (Supp. 2017). "Once the movant makes a prima facie showing by pleading an order and demonstrating noncompliance, 'the burden shifts to the respondent to establish his defense and inability to comply.' " Eaddy v. Oliver , 345 S.C. 39, 42, 545 S.E.2d 830, 832 (Ct. App. 2001) (quoting Henderson v. Henderson , 298 S.C. 190, 197, 379 S.E.2d 125, 129 (1989) ). "[A]ll contested issues in domestic relations actions filed in family court, except for cases set forth in Rule 3(b) or (c), are subject to court-ordered mediation under these rules unless the parties agree to conduct an arbitration." Rule 3(a), SCADR. "ADR is not required for ... family court cases initiated by [DSS]." Rule 3(b)(8), SCADR.
If any person or entity subject to the ADR Rules violates any provision of the ADR Rules without good cause, the court may, on its own motion or motion by any party, impose upon that party, person[,] or entity, any lawful sanctions, including, but not limited to, the payment of attorney's fees, neutral's fees, and expenses incurred by persons attending the conference; contempt; and any other sanction authorized by Rule 37(b), SCRCP.
Rule 10(b), SCADR.
Mother's arrest for DUI and DSS's resulting involvement was the catalyst for Grandparents' pursuing custody of Child. Furthermore, DSS continued "directing" the *524 case in many ways throughout the course of the proceedings. However, the only cases exempt from mediation are those "initiated" by DSS. See Rule 3(b)(8), SCADR ("ADR is not required for ... family court cases initiated by [DSS]."). Here, Grandparents initiated the custody action in family court. The family court ordered mediation and the record demonstrates Mother had notice of the mediation. In light of Mother's failure to attend, the family court awarded costs as permitted by Rule 10(b), SCADR, and we affirm that award.
CONCLUSION
We affirm the family court's ruling Grandparents had standing to file their action pursuant to section 63-3-550. Furthermore, we affirm the family court's dismissal of DSS from the case and affirm the award of costs and fees against Mother for **80 failing to attend mediation. Accordingly, the family court's order is
AFFIRMED .
LOCKEMY, C.J., and WILLIAMS, J., concur.

This section is now codified at section 63-5-530(A) and reads identically to the prior version cited in Middleton . See S.C. Code Ann. § 63-5-530(A)(20) (2010). It provides the family court has jurisdiction "to award the custody of the children, during the term of any order of protection, to either spouse, or to any other proper person or institution." S.C. Code Ann. § 63-5-530(A)(20).

While the family court relied at least in part on these theories and Child's best interests to determine Grandparents had standing, we base our finding in the additional sustaining ground raised by Grandparents on appeal that section 63-3-550 afforded standing to them under the facts of this case. See I'On, LLC v. Town of Mt. Pleasant , 338 S.C. 406, 419, 526 S.E.2d 716, 723 (2000) (instructing that a respondent "may raise on appeal any additional reasons the appellate court should affirm the lower court's ruling, regardless of whether those reasons have been presented to or ruled on by the lower court").